850 F.2d 927
 26 Fed. R. Evid. Serv. 154
 UNITED STATES of America, Appellee,
v.
Gilberto PINTO, Luis Moreno, Eduardo Vence, a/k/a "Bolo",
Enrique Moreno, Sylvio Sinisterra, Hugo Enriquez, Frederico
Gonzalez, Omar Ramirez, Tina Ramirez, Carlos Marin-Orozco,
Cesar Castano, Defendants,
Eduardo Vence, a/k/a "Bolo", Cesar Castano, Silvio
Sinisterra, a/k/a "Tio", Gilberto Pinto, Enrique Moreno,
a/k/a "Indigo", Luis Moreno, Carlos Marin- Orozco, Frederico
Gonzalez, Hugo Enriquez, Defendants-Appellants.
 No. 585, Docket 87-1104, 87-1111, 87-1120, 87-1160, 87-1161
and 87-1166 to 87- 1169.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 25, 1988.
Decided June 23, 1988.
 
 Richard Guay, New York City (Montclare & Guay, New York City, of counsel), for defendant-appellant Enrique Moreno.
 Richard B. Lind, New York City, for defendant-appellant Vence.
 David Seth Michaels, Spencertown, N.Y., for defendant-appellant Castano.
 Telesforo Del Valle, Jr., New York City, for defendant-appellant Sinisterra.
 Bert H. Nisonoff, Forest Hills, N.Y., for defendant-appellant Pinto.
 A. Matthew Broughton, New York City, for defendant-appellant Luis Moreno.
 Martin Goldberg, New York City, for defendant-appellant Marin-Orozco.
 Chris P. Termini, Melville, N.Y., for defendant-appellant Gonzalez.
 Paul Warburgh, New York City, for defendant-appellant Enriquez.
 Patricia A. Pileggi, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Emily Berger, Jacques Semmelman, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.
 Before OAKES, NEWMAN and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Appellants challenge their convictions, entered after a ten-week jury trial in the United States District Court for the Eastern District of New York (Maletz, J.), on forty-eight counts of a forty-nine count indictment for crimes arising out of a conspiracy to import and distribute cocaine. On appeal, they raise issues common to all appellants, principally a claim of prosecutorial misconduct relating to a potential defense witness. Individual appellants raise challenges to, inter alia, the conduct of the prosecutor in summation, the sufficiency of the evidence, and the admission of certain evidence at trial. Although none of the claims raised requires reversal, appellants have highlighted trial conduct of the Assistant United States Attorney ("AUSA") that gives us pause. We affirm the convictions in all respects, but not without noting our concern for the prosecutor's tactics.
 
 BACKGROUND
 The Conspiracy
 
 2
 Appellants were involved in a conspiracy to import large amounts of cocaine into the United States. Between 1983 and 1985, government agents traced the involvement of the conspirators in the importation, and attempted importation, of more than 150 kilograms of the drug. The conspirators concealed the cocaine on various Grancolombiana Lines ships bound for New York from Colombia. Crewmen on board the vessels were enlisted to hide the cocaine and to "off-load" it once the ships reached New York harbor. The cocaine was lowered over the side of the vessel to swimmers, who carried their cache to shore and eventually transferred it to others.
 
 
 3
 Government agents conducted extensive visual surveillance of the conspiracy's headquarters in Brooklyn, New York and videotaped the activities of some of the appellants there. The agents also intercepted numerous telephone conversations related to the conspiracy through authorized wiretap surveillance over a nine-month period ending in August 1985. Appellants Pinto, Vence, Luis and Enrique Moreno, Gonzalez and Sinisterra discussed the business of the conspiracy in coded conversations. Pinto headed the group, with defendants Vence, and Luis and Enrique Moreno, as his lieutenants. Defendants Enriquez, Gonzalez and Sinisterra were responsible for distributing the drugs to other drug traffickers.
 
 
 4
 Lamberto Aguirre-Castro ("Aguirre"), a seaman on the Grancolombiana Lines ship "SIMON BOLIVAR," cooperated with the government. He provided information about the workings of the conspiracy and allowed the government to record his conversations with some of the conspirators. Aguirre's testimony at trial was important in establishing the relationship among various members of the conspiracy and in linking them to the shipments.
 
 
 5
 Aguirre had observed two shipments, including an unsuccessful shipment, aboard the SIMON BOLIVAR in March and August 1984. In March, another seaman, Luis Lagos, recruited Aguirre to act as a lookout. Aguirre kept watch as a Colombian police officer, Lieutenant Ruiz, and a third member of the ship's crew brought cocaine aboard. Lagos promised Aguirre $16,000 for his participation. Despite the success of the March shipment, Aguirre was not paid for his services. His complaints to conspiracy members about his compensation led to a meeting with Luis and Enrique Moreno, whom Aguirre knew as organizers of the venture.
 
 
 6
 While Aguirre was attempting to secure payment for the March job, another member of the SIMON BOLIVAR's crew, Gonzalez-Solis, asked him to participate in an August shipment of cocaine. On July 31, 1984, while the vessel was docked at the Colombian port of Barranquilla, Aguirre again acted as a lookout. Following his instructions from Gonzalez-Solis, Aguirre signaled other crew members waiting in the ship's lounge, including appellants Castano and Marin-Orozco, at the moment the cocaine was delivered. They left the ship's lounge in response to Aguirre's signal.
 
 
 7
 The following day, August 1, 1984, the SIMON BOLIVAR left port, bound for New York. While en route, ship's officers discovered and confiscated the cocaine during a search of the vessel. Later, Aguirre met on several occasions with various members of the conspiracy, including Castano, both Moreno brothers and Pinto, to explain his actions during the voyage and quiet their suspicions that he was responsible for the confiscation.
 
 Arrests
 
 8
 The conspirators were arrested between April 10, 1985 and March 10, 1986. Several were arrested while in possession of controlled substances and firearms. Marin-Orozco was seized by U.S. Customs agents on February 18, 1986, while on a Grancolombiana Lines ship docked in Houston, Texas. One of the arresting agents, Julio Velez, told Marin that he knew about the August 1984 shipment. He mentioned the names of four others he knew to be involved in the conspiracy. After Marin was advised of his rights, he agreed to make a recorded statement, admitting his part in the August 1984 shipment. He identified the hiding place aboard the SIMON BOLIVAR, and informed Agent Velez that the cocaine had been stored in four or five dark trash bags.
 
 
 9
 Castano was arrested on the SIMON BOLIVAR while it was docked in New York in March 1986. He denied involvement with the conspiracy, claiming that he was on vacation at the time he allegedly aided in hiding cocaine aboard the vessel.
 
 Trial Proceedings
 1. Interview of Potential Defense Witness
 
 10
 At trial, defense counsel requested production of two federal inmates as potential witnesses for the defense. The two men, Mecolta and Palacio, had been convicted in a separate trial of conspiracy to possess cocaine. They had been arrested, wearing wetsuits, near the Brooklyn piers on August 12, 1984, in possession of nearly 70 pounds of the drug. The government showed that the cocaine was smuggled into the country aboard the REPUBLIC DE COLOMBIA, a Grancolombiana Lines vessel. At the subsequent trial of appellants, the government again offered this evidence in support of its case. The AUSA argued that Mecolta and Palacio were working for appellants.
 
 
 11
 Judge Maletz granted the defense motion for a writ of habeas corpus in aid of the testimony of Mecolta and Palacio and directed the government to produce the inmates. The AUSA twice called the court's attention to possible fifth amendment problems should the witnesses testify. At her suggestion, counsel was appointed to advise each witness.
 
 
 12
 Mecolta was produced, and a meeting at the courthouse with defense counsel was arranged. Mecolta's court-appointed attorney, accompanied by defense counsel and an interpreter, went to the courthouse detention facility to confer with Mecolta. They discovered that Mecolta had been taken from the facility to the AUSA's office for questioning by her case agents. Defense counsel moved immediately for a mistrial, alleging that the prosecutor's conduct had violated appellants' due process rights.
 
 
 13
 Judge Maletz conducted a hearing on the mistrial motion, taking testimony from Mecolta and others. Mecolta testified that the AUSA's agents had taken him to an office and asked him several questions. Mecolta refused, however, to recount any details of his meeting with the agents, and repeatedly invoked the fifth amendment in response to further questions. When Mecolta refused to testify, defense counsel moved for an order compelling the prosecutor to grant Mecolta immunity limited to his testimony about his meeting with the agents. Judge Maletz declined to order the prosecutor to grant immunity.
 
 
 14
 The two agents who questioned Mecolta testified that they interviewed Mecolta at the direction of the AUSA to determine what his testimony at trial might reveal. According to the agents, Mecolta was relaxed and unconcerned during the interview and did not object to speaking with them. No Miranda warnings were given, ostensibly in order to avoid intimidating Mecolta. Mecolta professed his neutrality and was puzzled that appellants considered him a potential witness. The agents also questioned him about his prior arrest and conviction.
 
 
 15
 Mecolta's counsel testified that the AUSA had refused to assure him that Mecolta would not be indicted on new charges in the event that, while on the stand, Mecolta disclosed criminal activities not subsumed in his prior indictment and conviction. After argument, Judge Maletz found insufficient evidence of witness intimidation and denied the mistrial motion. Defense counsel renewed the request for immunity so that Mecolta might testify fully. The court denied that request, and Mecolta never testified.
 
 2. The Prosecutor's Summation
 
 16
 At trial, defense counsel attempted to undermine the credibility of Agent Velez, who had interviewed seaman Marin-Orozco after his arrest. In particular, counsel sought to show on cross-examination that Velez had distorted or disregarded some of the details Marin allegedly provided, and that Marin's statement included many details known by other seamen not involved in the conspiracy. Defense counsel continued his attack on the agent's credibility during summation. He emphasized the inconsistency between Marin's alleged account that the drugs had been hidden on board the SIMON BOLIVAR in dark plastic trash bags and other prosecution evidence that the drugs had been carried aboard in suitcases. This was, perhaps, his strongest argument in answer to Velez's testimony. In support of the argument, defense counsel noted the AUSA's failure to place in evidence the plastic bags supposedly mentioned by Marin.
 
 
 17
 In rebuttal, the prosecutor emphasized defense counsel's failure to question Velez about this physical evidence on cross-examination; the prosecutor then offered an explanation for defense counsel's decision not to pursue this issue with the witness. She suggested that defense counsel was concerned that Agent Velez would have produced the evidence "because the one thing these agents do is they save everything. They save or photograph everything." In response to this remark, defense counsel moved for a mistrial and asked whether the government had the evidence mentioned. The prosecutor replied that she believed the agents had photographs of cocaine in dark plastic bags, but could not verify that the government had the bags. Judge Maletz denied the motion for a mistrial.
 
 DISCUSSION
 Prosecutorial Overreaching
 
 18
 Appellants contend that the district court erred in denying their motion for a mistrial based on prosecutorial intimidation of Mecolta. Under certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights. See, e.g., Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 353-54, 34 L.Ed.2d 330 (1972) (judge's unnecessary harangue of defendant's sole witness drove witness from the stand); United States v. Morrison, 535 F.2d 223, 228 (3rd Cir.1976) (prosecutor's intimidating interview of witness before start of defense case and indirect warnings concerning potential criminal liability dissuaded witness from testifying). The circumstances will warrant reversal only if the government's conduct interfered substantially with a witness's "free and unhampered choice" to testify. United States v. Goodwin, 625 F.2d 693, 703 (5th Cir.1980). That interference may involve threats of prosecution, e.g., United States v. Smith, 478 F.2d 976, 979 (D.C.Cir.1973), or other intimidating conduct, see, e.g., United States v. MacCloskey, 682 F.2d 468, 479 (4th Cir.1982) (prosecutor's "eleventh hour" telephone call to witness's attorney reminding him of potential fifth amendment problem if witness took stand), that was designed to intimidate, see, e.g., United States v. Whittington, 783 F.2d 1210, 1219 (5th Cir.), cert. denied, 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986); United States v. Little, 753 F.2d 1420, 1440 (9th Cir.1984). A court also will look to factors beyond the government's control to determine whether a witness's decision not to testify resulted from the government's conduct, cf. United States ex rel. Jones v. DeRobertis, 766 F.2d 270, 274-75 (7th Cir.1985) (witness apparently thought that petitioner's claim was meritless and "feared prosecution for perjury"), cert. denied sub nom. Jones v. DeRobertis, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986). Because the existence of substantial interference is a factual question, we may reverse the trial court's decision only if it is "clearly erroneous." Little, 753 F.2d at 1439.
 
 
 19
 Not surprisingly, the parties differ about the substance of the agents' testimony before Judge Maletz. Appellants claim that the prosecutor's case agents questioned Mecolta "in the customary manner of a post-arrest, custodial interrog[a]tion by the police." They note that the agents elicited false statements from Mecolta, and then confronted him with proof that his statements were false in order to gain leverage at the meeting. Appellants also observe that Mecolta told the agents: "I have a short time to go [in prison] and I want to remain neutral as far as everything is concerned, as far as the government is concerned," suggesting that Mecolta did not want to incur the government's disfavor by testifying for appellants.
 
 
 20
 The prosecutor maintains that the interview was conducted to determine the substance of Mecolta's testimony. She argues that the interview atmosphere was relaxed and that she took every precaution to ensure that the witness was not driven from the stand by the interview: The agents did not administer Miranda warnings, to avoid intimidating Mecolta; Mecolta was not threatened with prosecution if he chose to testify; and the agents never even discussed the effect of Mecolta's appearance as a witness on his prospects for parole.
 
 
 21
 Of course, Judge Maletz was responsible for reconciling these disparate views of the evidence. We note that his task was made particularly difficult because Mecolta refused to testify about the interview. Thus, the primary basis for the Judge's determination was the uncorroborated testimony of the prosecutor's case agents. Nevertheless, the agents were subject to cross-examination, and nothing elicited by defense counsel leads us to conclude that Judge Maletz's decision should be reversed. He was entitled to choose between conflicting views of the evidence and to rely upon the credibility of the witnesses before him. We cannot "wholeheartedly accept the government's assertions of the pristine nature of its motivations," United States v. Fricke, 684 F.2d 1126, 1130 n. 6 (5th Cir.1982), cert. denied, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983), but such misgivings, standing alone, are insufficient to warrant reversal, id.
 
 
 22
 Even assuming we were inclined to disturb the Judge's determination of this issue, a reversal would not be warranted. Recent cases have reviewed allegations of prosecutorial overreaching under the "harmless error" standard. See Little, 753 F.2d at 1439; Peeler v. Wyrick, 734 F.2d 378, 381 (8th Cir.), cert. denied, 469 U.S. 1020, 105 S.Ct. 437, 83 L.Ed.2d 363 (1984); see also United States v. Hasting, 461 U.S. 499, 508-09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983) (duty of appellate court is "to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations"). Because we confront an allegation of constitutional error, we may affirm only if that error is harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
 
 
 23
 The alleged error cannot serve as a basis for reversal. Appellants have offered nothing, beyond their conclusory assertions of Mecolta's importance, that evinces a "reasonable possibility that the testimony ... would have affected the ... verdict," Peeler, 734 F.2d at 382. Although appellants now claim that Mecolta was "the main defense witness," the record is devoid of any support for that claim. Admittedly, the prosecutor's action may have denied counsel an opportunity to determine the substance of Mecolta's testimony. However, some of that information was available from other sources, including the record of Mecolta's testimony at his own trial and appellants' knowledge of his value as a witness. Furthermore, although appellants asked the government to produce Mecolta's confederate, Palacio, he never testified. Counsel has offered no explanation for the decision to forgo Palacio's testimony. Nor have appellants made any attempt to explain why Mecolta, rather than Palacio, was the "main defense witness." In the absence of any showing that the loss of Mecolta's testimony altered the trial outcome, we are constrained to conclude that the error was harmless beyond a reasonable doubt.
 
 
 24
 Although we uphold the government's position on this issue, we are dismayed by the prosecutorial tactics involved. First, we note that, even assuming a proper motivation, the timing of the AUSA's interview and her failure to notify either Mecolta's attorney or defense counsel of the intended interview created an appearance of impropriety. By failing to inform the relevant parties of her intention, the AUSA exposed her office to accusations of taking unfair advantage. This risk could have been avoided had the prosecutor been more attentive to her professional responsibilities.
 
 
 25
 Second, and more important, the prosecutor's direction to the agents to proceed with the interview without warning Mecolta of possible self-incrimination is inconsistent with established standards of prosecutorial conduct. See STANDARDS RELATING TO THE ADMINISTRATION OF CRIMINAL JUSTICE, Standard 3-3.2(b) (1979) (before interviewing prospective witness, prosecutor or prosecutor's agent "should advise the witness concerning possible self-incrimination and the possible need for counsel").[1] In this regard, we observe that the AUSA's professed concern for avoiding intimidation of the potential witness cannot justify her actions. Once appointed, Mecolta's counsel was the appropriate representative of his client's interests, and his participation could have reduced substantially the risk of witness intimidation.
 
 
 26
 However, it is the prosecutor's conscious choice to exclude Mecolta's counsel from the interview that gives us the greatest pause. To her credit, the AUSA insisted that the court appoint an attorney to safeguard Mecolta's interest. Having fulfilled that professional obligation, she proceeded to subvert the very safeguards she had urged upon the court. We question the ethical propriety of interviewing a potential criminal defendant, represented by counsel, without counsel's knowledge or consent, especially when the interview is likely to elicit information that might lead to indictment of the interviewee. Under Disciplinary Rule 7-104(A)(1) of the Code, "a lawyer shall not ... [c]ommunicate or cause another to communicate on the subject of [his client's] representation with a party he knows to be represented by a lawyer in that matter," unless the party's lawyer consents, or the communication otherwise is "authorized by law." N.Y.Code of Professional Responsibility DR 7-104(A)(1), N.Y.Jud.L. app. at 489 (McKinney 1975). Prosecutors are bound by this rule, see United States v. Hammad, 846 F.2d 854, 857-58 (2d Cir.1988); United States v. Foley, 735 F.2d 45, 48 (2d Cir.1984), cert. denied sub nom. Edler v. United States, 469 U.S. 1161, 105 S.Ct. 915, 83 L.Ed.2d 928 (1985), as are "non-attorney government law enforcement officers when they act as the alter ego of government prosecutors," United States v. Jamil, 707 F.2d 638, 645 (2d Cir.1983).
 
 
 27
 This Court has applied DR 7-104 to the government's conduct in criminal cases sparingly, in light of our concern that the rule might hamper the government's ability to conduct legitimate criminal investigations. We have rejected a rule that would allow criminal suspects to avoid investigation simply by retaining counsel. See United States v. Vasquez, 675 F.2d 16, 17 (2d Cir.1982). In Jamil, for example, we declined to find a violation of the rule where non-lawyer government law enforcement officers secured incriminating admissions from a potential defendant without the knowledge of the prosecutor, in a pre-indictment, pre-arrest, non-custodial situation, Jamil, 707 F.2d at 646. Recently, however, we indicated that the interview of a potential defendant by an "alter ego" of the AUSA implicated DR 7-104(A)(1), finding that the rule applied even though sixth amendment protections had not attached, Hammad, 846 F.2d 858.
 
 
 28
 Of course, the issue before us differs substantially from these cases, because we are considering appellants' due process rights to Mecolta's testimony, not Mecolta's right to counsel. Nevertheless, we think, under the circumstances, that the standard of conduct set forth in DR 7-104(A)(1) should have guided the prosecutor's conduct in this case. The AUSA argues that, "because Mecolta was only a witness," she was not obligated to ensure that his counsel was present before questioning began. She asserts the government's right to investigate trial witnesses for cross-examination or impeachment purposes, see, e.g., Little, 753 F.2d at 1440, as a justification for her decision. We disagree. The prosecutor was well aware that Mecolta was not merely a witness. He was also a potential defendant who was likely to reveal information that might compromise his fifth amendment rights. Especially in light of her representation to Mecolta's attorney concerning his client's potential criminal exposure, we reject her claim that Mecolta was only a witness.
 
 
 29
 Nevertheless, we need not, and do not, find a violation of DR 7-104(A)(1) in this case. The prosecutor's conduct, however "unseemly," Whittington, 783 F.2d at 1219, did not deny appellants due process. See id.
 
 Witness Immunity
 
 30
 Appellants argue that the trial judge erred in denying their requests that Mecolta be granted immunity. The fifth amendment due process clause does not mandate "that defense witness immunity must be ordered whenever it seems fair to grant it." United States v. Turkish, 623 F.2d 769, 777 (2d Cir.1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). The government may not be compelled to grant a defense witness immunity absent "extraordinary circumstances." United States v. Praetorius, 622 F.2d 1054, 1064 (2d Cir.1979), cert. denied sub nom. Lebel v. United States, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). In cases involving a defense witness's decision to invoke the fifth amendment on the stand, this Circuit employs a three-part test to determine whether the trial court should have ordered immunity: (1) prosecutorial overreaching must force the witness to invoke the privilege; (2) the witness's testimony must be material, exculpatory and not cumulative; and (3) the defendant must have no other way to obtain the evidence. United States v. Calvente, 722 F.2d 1019, 1025 (2d Cir.1983), cert. denied, 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985). The defendant bears the burden of convincing the court that each of these elements is present. United States v. Todaro, 744 F.2d 5, 9 (2d Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985). Since we have found no error in the district court's finding that there was no prosecutorial overreaching, appellants' claims of error as to both motions for immunity also must fail.
 
 Admission of Summary Charts
 
 31
 Appellants claim error in Judge Maletz's decision to admit summary charts prepared by the government. However, the court's decision will not be overturned in the absence of an abuse of discretion, see Fed.R.Evid. 611(a)(1) advisory committee notes; United States v. Baccollo, 725 F.2d 170, 173 (2d Cir.1983). The ten-week trial in this case involved numerous witnesses and voluminous evidence, including references to 66 wiretaps of telephone calls placed to some 35 telephone numbers. The government's summaries included the names of identified participants in the telephone conversations, the numbers used by conspirators and the addresses of several conspirators' residences, where calls were placed or received. The trial judge did not abuse his discretion in determining that these charts would be helpful to the jury and not cumulative. With due regard for the possibility that the jury would accept such summaries as documentary fact, the trial court repeatedly reminded the jurors of their responsibility to determine whether the charts accurately reflected the evidence presented, see United States v. Citron, 783 F.2d 307, 317 (2d Cir.1986); United States v. Goldberg, 401 F.2d 644, 647-48 (2d Cir.1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969). Finally, we find no error in the court's decision to allow the properly admitted summary charts into the jury room during deliberations. United States v. Scales, 594 F.2d 558, 564 (6th Cir.), cert. denied, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979); see also Citron, 83 F.2d at 317 (allowing charts, admitted without proper basis, into jury room during deliberations is error).
 
 Claims of Individual Appellants
 1. Marin-Orozco
 
 32
 Appellant Marin-Orozco challenges the prosecutor's suggestion, in rebuttal summation, that government agents had saved or photographed everything, including the dark plastic bags mentioned by Agent Velez. Marin argues that the prosecutor referred to facts not in evidence to corroborate the agent's testimony, violating Marin's right "to be tried solely on the basis of the evidence presented to the jury," United States v. Young, 470 U.S. 1, 18, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). The AUSA suggests that her comment was merely a "vigorous" response to defense counsel's argument, see United States v. Caputo, 808 F.2d 963, 968-69 (2d Cir.1987). She asserts her right to respond to defense counsel's challenge ("Let's see how [the AUSA] handles this"), in essence contending that she cannot be faulted for taking up her adversary's gauntlet.
 
 
 33
 While the AUSA certainly was entitled to respond, she was obligated to tailor her reply to the occasion, see United States v. Bagaric, 706 F.2d 42, 60 (2d Cir.), cert. denied sub nom. Logarusic v. United States, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). "An observation that evidence adduced by the government was not confronted on cross-examination is entirely proper," United States v. Walker, 835 F.2d 983, 989 (2d Cir.1987). However, comments that "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant ... jeopardize the defendant's right to be tried solely on the basis of the evidence presented," Young, 470 U.S. at 18, 105 S.Ct. at 1048. The AUSA offered her hypothesis concerning defense counsel's failure to cross-examine Agent Velez fully, including the suggestion that, had counsel pursued that line of questioning, he might have uncovered the existence of physical evidence unfavorable to his cause. She attempted to bolster her theory with the palpable hint that the agents possessed the evidence and, if necessary, could place it before the jury. In our opinion, the prosecutor's comments were "especially improper" because they were "phrased to leave the impression that [her] opinion [was] based on matters in the investigative file and not in the trial evidence," United States v. Modica, 663 F.2d 1173, 1179 (2d Cir.1981), cert. denied, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).
 
 
 34
 Of course, while we find the prosecutor's conduct less than laudatory, that alone is not enough for reversal. This Court has noted that "criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone in an otherwise fair proceeding." United States v. Biasucci, 786 F.2d 504, 514 (2d Cir.), cert. denied, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). Therefore, in evaluating whether the AUSA's conduct warrants reversal, we must consider whether it resulted in substantial prejudice to the defendant's right to a fair trial, Modica, 663 F.2d at 1181, weighing "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements," id. The trial court's failure to sustain an objection to the offensive statement or offer a curative instruction to the jury is not dispositive of the "substantial prejudice" issue, see id.
 
 
 35
 Judge Maletz failed to caution the jury to ignore the prosecutor's comment. It is entirely possible, therefore, that the AUSA enhanced Agent Velez's credibility with her improper remark. Nevertheless, we find the prosecutor's comment of relative insignificance, in light of the evidence adduced independent of Agent Velez's testimony that links Marin to the conspiracy. Aguirre testified that: (1) Marin was one of the seamen Aguirre was told to signal once the August 1984 shipment was brought aboard the SIMON BOLIVAR; (2) as planned, he signaled Marin and the others, and they responded; (3) twenty minutes later, Marin and Aguirre met below deck and discussed Aguirre's compensation; and (4) Marin was one of the conspirators mentioned by name during Aguirre's discussion with appellant Luis Moreno concerning the loss of the August 1984 shipment. We conclude that this testimony was sufficient to support the inference that Marin was an active participant in the conspiracy. Therefore, Marin's conviction was certain without considering the evidence tainted by the prosecutor's improper rebuttal. Any prejudice that might have resulted from the improper remark is not substantial enough to warrant reversal.
 
 2. Castano
 
 36
 Appellant Castano claims that the government failed to present sufficient evidence to support his convictions for conspiracy to import cocaine and possession of more than 45 kilograms of cocaine in July 1984. He argues that co-conspirator hearsay was admitted against him without a proper foundation under Fed.R.Evid. 801(d)(2)(E), and that, without this evidence, the government failed to meet its burden. In considering Castano's challenge to the sufficiency of the evidence, we must view the evidence, including all inferences that can be drawn, in the light most favorable to the government. Bagaric, 706 F.2d at 64. The court evaluates the cumulative effect of the evidence, not the probative value of each piece of evidence in isolation. United States v. Khan, 787 F.2d 28, 33-34 (2d Cir.1986). The issue presented is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), which we resolve with due consideration for the jury's power to determine credibility, see United States v. Martino, 759 F.2d 998, 1002 (2d Cir.1985), and to rely upon inferences drawn from circumstantial evidence, United States v. Mariani, 725 F.2d 862, 865-66 (2d Cir.1984).
 
 
 37
 At the outset, we disagree with Castano's contention that the statements of his co-conspirators were admitted without sufficient foundation under Fed.R.Evid. 801(d)(2)(E). Co-conspirator hearsay is admissible upon a showing of "a likelihood of an illicit association between the declarant and the defendant." United States v. Alvarez-Porras, 643 F.2d 54, 57 (2d Cir.), cert. denied sub nom. Garcia-Perez v. United States, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981). At the time this case was tried, the foundation for admission of co-conspirator statements was drawn solely from evidence of participation in the conspiracy independent of the hearsay itself. See United States v. Jaramillo-Montoya, 834 F.2d 276, 278 (2d Cir.1987).[2]
 
 
 38
 Based on our examination of the entire record, we find sufficient independent evidence of Castano's involvement in the conspiracy to support admission of the hearsay statements. Aguirre testified that: (1) he saw Castano with Ramiro, an unindicted co-conspirator, on board the SIMON BOLIVAR the day before the August 1984 shipment was loaded onto the ship; (2) Castano was one of the men in the ship's lounge who responded to Aguirre's signal once the cocaine was brought aboard; and (3) Castano and Ramiro met with Aguirre after the August 1984 shipment was seized, and interrogated him concerning the circumstances of the seizure. Moreover, despite the substantial evidence of Castano's association with Ramiro, including an entry in Castano's address book for Ramiro, Castano denied knowing Ramiro during post-arrest interrogation.
 
 
 39
 This independent evidence linked Castano to the conspiracy sufficiently for purposes of Fed.R.Evid. 801(d)(2)(E). Castano's participation in the meeting with Ramiro was especially probative of his involvement. During this meeting, Castano sat silently, except to ask Aguirre why he had remained on the vessel despite the fact that he was eligible for vacation time. Castano's very attendance at the meeting suggests concern about the seizure, and his question indicates familiarity with the workings of the conspiracy. In addition, a rational juror could have found Castano's attempt to disassociate himself from a fellow conspirator probative as a false exculpatory statement, see United States v. Durrani, 835 F.2d 410, 424 (2d Cir.1987). Accordingly, we conclude that the government produced sufficient evidence to warrant introducing the co-conspirator hearsay against Castano.
 
 
 40
 Once the co-conspirator statements are included in the case against Castano, a rational juror could infer his guilt beyond a reasonable doubt. Gonzalez-Solis, an unindicted co-conspirator, identified Castano as one of the SIMON BOLIVAR crew involved in the August 1984 shipment. In a conference with Enrique and Luis Moreno, Aguirre named Castano as one of those responsible for the seizure of the shipment. Enrique Moreno stated that Castano and the others would be disciplined for their error. These statements corroborated the other evidence linking Castano to the August 1984 shipment.
 
 
 41
 Castano's counsel has attempted to raise a reasonable doubt before this Court, arguing that Castano left the SIMON BOLIVAR at 6:00 p.m. on July 31, 1984. He offers the ship's log as conclusive proof of the date and time of his client's departure. He also submits Castano's passport as evidence that the seaman disembarked in Colombia on that date. We agree with the AUSA that this evidence is not inconsistent with Castano's participation in the August 1984 shipment. Neither the ship's log nor the passport establishes the precise time of Castano's departure. Aguirre stated that the cocaine was delivered during the evening of July 31. Although Castano was logged out at 6:00 p.m., nothing in the log indicates that he left the vessel at that time. Castano's passport is stamped with the date, but no time is indicated. It was therefore not unreasonable for the jury to conclude that Castano signed out at 6:00 p.m., but remained on board the vessel until after the delivery arrived. As the prosecutor argues, this is consistent with Aguirre's claim that Castano was in the ship's lounge, not on duty, when Aguirre gave the signal. When the evidence of Castano's guilt, together with all reasonable inferences that can be drawn, is considered in the light most favorable to the government, we must conclude that any rational juror could find guilt beyond a reasonable doubt.
 
 
 42
 We have considered the other arguments raised by the appellants and find them without merit. We therefore affirm appellants' convictions in all respects. However, affirmance does not carry with it our imprimatur for the prosecutor's trial tactics. Both her conduct toward the potential defense witness and her comments on rebuttal suggest a less than adequate regard for her professional responsibilities. A prosecutor is not solely an advocate; she is a representative of the sovereign. In that capacity she is expected to exercise restraint, and, as one whose decisions "affect[ ] the public interest," she "should be fair to all," N.Y.Code of Professional Responsibility EC 7-13, N.Y.Jud.L. app. at 474 (McKinney 1975).
 
 CONCLUSION
 
 43
 The judgments of conviction are affirmed.
 
 
 
 [1]
 Standard 3-3.2 appears in Part III of the ABA Standards, which is entitled "Investigation for Prosecution Decision." Although we confront the AUSA's post-indictment conduct in this case, we find the standard relevant because the prosecutor would not agree to forgo indicting Mecolta on new charges if he revealed details of other criminal activities not subsumed in his prior indictment. Therefore, the AUSA's interview was sufficiently analogous to a pre-indictment investigation to come within the spirit, if not the letter, of Standard 3-3.2
 
 
 [2]
 The Supreme Court announced its departure from the independent evidence requirement in Bourjaily v. United States, --- U.S. ----, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In determining the admissibility of co-conspirator hearsay, the trial court now may consider the hearsay as evidence of defendant's participation in a conspiracy. Id. at 2781-82. Since we uphold admissibility under the pre-Bourjaily standard, we need not consider whether that decision may be applied to a trial conducted before the decision was rendered