UNITED STATES of America, Appellee,

v.

Nicholas DELIA, Defendant–Appellant.

No. 1389, Docket 90–1745.

United States Court of Appeals,
Second Circuit.

Argued May 14, 1991.

Decided Sept. 12, 1991.

See also 925 F.2d 574.

Gerald L. Shargel, New York City (Nich-
olas A. Gravante, Jr., of counsel), for de-
fendant-appellant Nicholas Delia.

Jonathan R. Liebman, Asst. U.S. Atty.,
S.D.N.Y., New York City (Otto G. Obermai-
er, U.S. Atty. and Howard E. Heiss, Asst.
U.S. Atty., of counsel), for appellee U.S. of
America.

Before LUMBARD, FRIEDMAN* and
CARDAMONE, Circuit Judges.

FRIEDMAN, Circuit Judge:

The appellant, Nicholas Delia, challenges
his conviction in the United States District
Court for the Southern District of New
York (Sweet, J.), on one count of conspir-
acy to make, utter, and possess forged
checks of an organization with intent to
deceive, in violation of 18 U.S.C. §§ 371,
513 (1988), and three counts of making,
uttering, and possessing forged checks of
an organization with intent to deceive, and
the aiding and abetting thereof, in violation
of 18 U.S.C. §§ 2, 513 (1988). 749 F.Supp.
500. He asserts that the venue on the
three substantive counts was improperly
laid in the Southern District of New York,
that the district court improperly admitted
evidence that he was connected with an
organized crime family, and that the court
committed reversible error in refusing to
require the prosecution to disclose to the
defense rebuttal evidence that the govern-

* Daniel M. Friedman, of the Court of Appeals for the Federal Circuit, sitting by designation.

ment would offer if the defense pursued a particular theory. We affirm.

## I

Delia's convictions stem from a scheme to forge and negotiate stolen checks of Bayside Management Company (Bayside), a division of Continental Reinsurance Company (Continental), a corporation in New York City. The government's case rested primarily on the testimony of Madeline Rosales and Madelyn Vega, both former Continental employees. Viewing the facts most favorably to the government, which is the standard on appeal from criminal convictions, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Gonzalez*, 922 F.2d 1044, 1053 (2d Cir.1991), there was evidence from which the jury could have found the following:

In August 1986, Delia, married and living in Brooklyn, began dating Rosales, who worked in a clerical position at Continental. One to two weeks later, Rosales introduced Delia to her best friend, Vega, another Continental employee. Delia asked Rosales about Vega's job, and Rosales responded that "she works with checks" at Continental.

Delia "told" Rosales to call Vega and "see if she can get some checks." Delia stated that he planned to find out Continental's account balance and forge the checks. Rosales asked Vega if she could "get some checks" for Delia. Vega subsequently gave Rosales in Continental's Manhattan office three blank checks, which Rosales gave to Delia at his Brooklyn apartment. Delia then told Rosales that "he knew someone who could forge signatures," but needed "a copy of someone's signature that was high in the company." On Rosales' request, Vega secured a copy of the signature of a Continental executive authorized to sign checks, Walter J. Gross, and gave it to Rosales, who then gave it to Delia.

Subsequently, Delia and an individual identified as "Joseph Slacks" met in Delia's Brooklyn apartment to discuss the blank checks and the signature specimen. Ro-

sales, who was living in Delia's apartment at the time, was present. Delia instructed Rosales to ask Vega if Continental used "some kind of code" on its checks, and if so, whether it consisted of "not only numbers but [ ] letters too." Rosales obtained the information from Vega, and gave it to Delia.

On October 23, 1986, a bank account was opened in the name of "John Stella" at a Brooklyn savings and loan association. The identification used to open this account was fake and untraceable. From October through December 1986, the three checks stolen by Vega were deposited in the account. These deposits, totalling approximately $191,675.00, were negotiated through Bayside's bank in Manhattan. Each check was a forgery payable to "John Stella" and bearing the signature of "Walter J. Gross." During that same period, a total of $165,993.00 was withdrawn from the account. There was no other activity in the account.

In January 1987, a Continental employee discovered the three forged checks while reconciling the Bayside bank account. The employee determined that the checks had been taken from the last page in a book of Bayside checks maintained at Continental's Manhattan office.

After the checks were stolen, Rosales quit her job at Continental and moved into an apartment Delia leased. Delia subsequently persuaded Rosales to become a prostitute. He made arrangements for her to work at two different locations and told her to use a false name. She turned over to him her earnings from prostitution. She "never" had "done anything like that before." Her work as a prostitute went on for three months.

Count One of the indictment charged a conspiracy to make, utter, or possess a forged security of an organization with intent to deceive, in violation of 18 U.S.C. § 513, and Counts Two through Four charged the substantive offenses and the aiding and abetting thereof, in violation of 18 U.S.C. §§ 2, 513. After a six-day jury trial, Delia was convicted on all counts. The district court sentenced Delia to three

and one-half years imprisonment on Count One, suspended sentence on Counts Two through Four and placed Delia on three years probation on each of those counts, to commence upon the completion of his prison term and conditioned upon Delia's making restitution of $165,993.00 (the amount of the thefts), and imposed $200 in special assessments.

## II

Delia challenges his convictions on Counts Two through Four on the ground that venue was improper in the Southern District of New York, and should have been in the Eastern District.

At the close of the government's case, Delia moved to dismiss the three substantive counts, arguing that the government failed to prove he "made," "uttered," or "possessed" a forged security in the Southern District of New York. The district court, both orally and in a post-verdict opinion, denied the motion. *United States v. Delia*, 749 F.Supp. 500 (S.D.N.Y.1990). The court relied primarily on the test for venue set forth in *United States v. Reed*, 773 F.2d 477 (2d Cir.1985), where this court stated:

[T]here is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding...."

*Id.* at 481.

Delia argues that "the crime of 'making' the forged checks did not take place when the blank checks or the signature were stolen, or even when they were allegedly received by Delia. Instead, the crime charged here—even if it could be characterized as a 'continuing offense'— *began* when the forged checks were made, *continued* throughout the entire period in which they were possessed, and *ended* when they were uttered." (emphasis in

original). He asserts that there was no evidence in the record "that Delia *or any of the persons with whom he was alleged to have conspired or aided and abetted* had 'made' the forged checks in Manhattan," since it was "clear that the checks were *blank—not forged*—at the time [Rosales] gave them to him." (emphasis in original).

The district court correctly rejected this argument. Relying on *Reed, supra,* and *United States v. Chestnut,* 533 F.2d 40, 46–47 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976), the court examined the "key verbs" that 18 U.S.C. § 513(a) uses in defining the offense. Distinguishing the verb "utter" from the verb "make," the court stated:

Unlike "uttering" which requires solely the act or declaration that something is good or the offer to show what is good, "making" is a verb connoting a broader spectrum of action. To make or create you need to bring something into being and to do so in the context of a forged check requires some ingredient. Here, the making of the forgery required both the checks and the traceable signature from Manhattan. Given the nature of this task to be performed, obtaining the ingredients was the beginning of the making, not the acts preparatory to the making.

*United States v. Delia,* at 503 (citations omitted).

The court further stated:

Delia's narrow interpretation of the word "making," merely would allow for the putting of the pen to paper to trace the name onto the check. "Making" cannot be read so narrowly in this context. The beginning of the making occurred with the theft of the signature, if not the theft of the blank checks from the Manhattan office. The procuring [of] the ingredients of this act of creation—the checks, the signature—were beyond preparatory, and instead essential to the accomplishment of the crime of "making."

*Id.* at 502–03 (citation omitted).

The court thus held that, unlike "uttering," the "making" of a forged security is

not a single-act crime consisting solely of the actual forgery of the check, but is a continuing offense of which the actions of Rosales and Vega, performed in the Southern District at Delia's instructions, were an integral part. Their actions were not merely preparatory acts, but constituted the beginning of the act of "making." We agree with that analysis.

■ The "making" of a forged security that § 513 condemns is a broader crime than the forgery itself. Section 513 (previously codified at 18 U.S.C. § 511) was enacted as part of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 1105(a), 98 Stat. 2144 (1984), "to combat widespread fraud schemes involving the use of counterfeit State and corporate securities." S.Rep. No. 225, 98th Cong., 2d Sess. 371, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3512. Part of the conduct § 513 covers is the production of forged instruments, and not just the act of forgery. The statute punishes "[w]hoever makes ... a forged security," rather than, as Delia would have it, "whoever forges a security." The two offenses are different. *Cf.* 18 U.S.C. § 510(a)(1) (punishing "[w]hoever ... falsely makes or forges" a United States security).

In the present case, the "making" of the forged checks included the first and essential steps in the fraudulent scheme, i.e., the acquisition of both the checks and the traceable signature. These events took place in the Southern District, in Manhattan. The fact that the checks were blank when Rosales gave them to Delia did not make their stealing in Manhattan any less a part of the beginning of the "making" of the forged checks.

The government's evidence thus showed that a critical part of the substantive offense—the first steps in the making of the forged checks—occurred in the Southern District and that Delia, at the very least, aided and abetted these efforts. As the district court noted:

No party contends that Delia walked into the Southern District at any time to commit these crimes. Instead the thrust of

the crimes charged in this case—both the conspiracy and substantive counts—is that Delia had an agency relationship with Madeline Vega (who took the checks for Rosales) and Rosales, accomplices and unindicted coconspirators, and that they acted at Delia's behest and he acted through and with them in the Southern District in violation of the crimes charged.

*United States v. Delia,* at 505. Counts Two through Four charged Delia with making, uttering, and possessing forged checks of an organization with intent to deceive that organization, and the aiding and abetting thereof, 18 U.S.C. §§ 2, 513. Under 18 U.S.C. § 2, Delia was triable as a principal in the district where the substantive offense was committed. *See United States v. Gillette,* 189 F.2d 449, 451 (2d Cir.), *cert. denied,* 342 U.S. 827, 72 S.Ct. 49, 96 L.Ed. 625 (1951); *see also United States v. Bozza,* 365 F.2d 206, 221 (2d Cir.1966) (regarding 18 U.S.C. § 2, "Congress seems to have been content with venue where the defendant's own accessorial acts were committed or where the crime occurred."); 2 Wright, *Federal Practice and Procedure: Criminal 2d* § 303, at 208–09 (2d ed.1982). Here, the substantive offenses began in the Southern District and were committed in part there. Delia was properly tried for those offenses in that district.

Our conclusion is further supported by 18 U.S.C. § 3237(a), which states that, unless Congress expressly has provided otherwise, "any offense against the United States begun in one district and completed in another ... may be ... prosecuted in any district in which such offense was begun, continued, or completed." Here, as we have held, the making of the forged checks was begun in the Southern District and completed in the Eastern District. Under 18 U.S.C. § 3237(a), venue lay in either district.

Delia relies heavily upon *United States v. Bozza,* 365 F.2d 206, 221 (2d Cir.1966). As the district court correctly pointed out, *Bozza* dealt with a single act offense—the receipt of stolen goods—whereas the present case involves a continuing offense.

## III

■ A. On re-direct examination, Rosales testified that before Delia first mentioned the check forgery scheme or convinced her to become a prostitute, he told her "that he was from the organized crime, Gambino Family." Rosales further testified that she "never forgot" Delia's statement "that he was with the Gambino Family." Delia argues that the district court should have excluded the "Gambino statement" because of its prejudicial effect.

The facts relating to the admission of this evidence are as follows:

Before trial, the government informed the court and defense counsel of its intention to introduce the Gambino statement if Rosales' credibility were attacked. Before Rosales' direct testimony, the court heard argument regarding the statement and reserved decision about its admissibility until after cross-examination, noting its "highly prejudicial nature." After an extensive and searching cross-examination that attacked Rosales' credibility, the court again heard argument on the issue and decided to admit the testimony, reasoning:

I, certainly having tried more than one organized crime case, am quite familiar with the prejudicial nature of the statement attributed to Mr. Delia. Indeed, I suppose, in our city it's about as prejudicial a statement as can be made ...

So the case is unique in that both the probative aspect of the statement and the prejudice are very strong.

The probative aspect of it derives from the nature of the acts which are described, which were described in the direct testimony, which really almost are unbelievable without this statement. The probative value of the testimony is very strong.

Also another aspect of this is that this is, after all, according to the witness, if the witness is to be believed, this is of the defendant's own making and his statement.

So trying to balance the factors that— and, quite evidently, the cross-examination of the witness was aimed at destroying her credibility, and indeed everybody agrees that the issue of credibility is the key, key issue before the jury, to deprive them of a comment which, although the witness hasn't been asked, if she were I'm sure she would say was a controlling factor in her activities, I think would be to deprive the jury of a fact that really is essential to understanding the testimony.

B. Rule 403 of the Federal Rules of Evidence authorizes a district court to exclude otherwise relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice...." "[T]he long held view of this Circuit [is] that the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984). "The trial judge must weigh the probative value of the evidence against its tendency to create unfair prejudice and his determination will rarely be disturbed on appeal." *United States v. Scarpa*, 913 F.2d 993, 1016 (2d Cir.1990) (quoting *United States v. Ravich*, 421 F.2d 1196, 1203–04 (2d Cir.), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970)). To establish that the district court abused its discretion, it must be shown that the court acted "arbitrarily or irrationally," that is, without making a "conscientious assessment" of whether the unfair prejudice substantially outweighs the probative value. *United States v. Birney*, 686 F.2d 102, 106 (2d Cir.1982) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir.1980)).

The district court did not abuse its discretion in admitting Rosales' testimony regarding the Gambino statement. The court carefully weighed the prejudicial effect of the statement against its probative value, and justifiably concluded that the former did not substantially outweigh the latter.

Rosales was the government's key witness. She testified that Delia arranged the forgery scheme and that both she and Vega followed Delia's instructions. As the district court recognized after her cross-

examination, Rosales' credibility was the major issue before the jury.

The Gambino statement enhanced Rosales' credibility in two ways.

First, it provided a convincing explanation of why she followed Delia's instructions to steal the blank checks and the signature and, also, why she followed his wishes by becoming a prostitute. Her belief that he was connected with the Gambino organized crime family necessarily influenced her behavior because of her fear of what such a man could and probably would do to her if she disobeyed his instructions and wishes. She stated that she "never forgot" Delia's statement "that he was with the Gambino Family." Although, as Delia points out, Rosales did not testify that she acted because of fear of Delia, the jury was justified in inferring that that was a major reason for her conduct. The Gambino statement also would help the jury to understand what the district court described as otherwise "unbelievable" acts.

Second, Rosales' belief in Delia's organized crime connection made it less likely that she would concoct such a story against him and thereby subject herself to whatever revenge Delia and other members of the Gambino family might take against her for a fabricated accusation.

The district court's careful balancing of the probative value of the evidence against its prejudicial effect, done only after Rosales' cross-examination had been completed and her credibility vigorously challenged, warranted its decision to admit the evidence.

## IV

■ The indictment under which Delia was tried and convicted was a superseding indictment. The original indictment charged Delia not only with the forged check offenses, but also with bank fraud and conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1344. The indictment alleged that Delia had (1) opened a savings account in the name of John Stella at the Brooklyn bank; (2) deposited the forged and stolen checks through that account on three occasions; and (3) made withdrawals from that account. The indictment also alleged that Delia "deposited approximately $191,000 in forged and stolen checks into an account controlled by him from which he subsequently made withdrawals."

The superseding indictment, filed approximately two months later, eliminated the bank fraud charges. It was filed after the district court had ordered a hearing to consider Delia's claim that the photographic identification procedure, on the basis of which bank employees identified Delia as the person who had opened the account, was "unduly suggestive," and a report from Delia's counsel that his handwriting expert had concluded that Delia's handwriting did not appear on the "John Stella" bank records or the forged checks.

A.  Before trial, Delia moved *in limine* to cross-examine government witnesses about the changes in the indictments and, "if necessary, call an agent of the government during the defense case." Delia argued that a "critical part of the defense" would be that the government "fabricated" its case and "drastically tailored its version of the facts" in response to his expert forensic evidence that Delia did not make the signatures on the three forged checks. Delia emphasized that the superseding indictment no longer named him as the individual who opened the savings account, deposited the forged checks, or made the withdrawals. Delia sought to "examine the government on the prior complaint and indictment and the facts giving rise to these documents."

In a written response to the motion, the government did not object to Delia's proposed cross-examination, but noted that in such event, it would seek an opportunity "either on cross-examination or on a rebuttal case, to explore the factual basis behind the initial charges and the subsequent alteration in charges." The government stated:

> While much of that information is technically hearsay, it is beyond dispute that Delia will have opened the door to such testimony by eliciting the *fact* that the

complaint and first indictment were different in support of his allegation that the Government "tailored" the facts to "fabricate" its case against Delia. The Government will simply ask the case agent to explain *why* he drew the conclusions he did in the complaint and *why* the Government sought a superseding indictment. Such testimony is plainly admissible to rebut the serious accusations leveled by Delia.

The Government alerts the Court and counsel to this situation so that it may not be said that the defense was "sandbagged" when damaging and otherwise inadmissible testimony comes in as a result of Delia's door-opening. (emphasis in original).

Two days before trial, the court heard arguments on the motion *in limine*. Delia expressed concern that the proposed testimony "would be opening the door to what is technically hearsay," to which the court responded, "[i]f it is hearsay it doesn't get in. Not to worry." Delia also sought disclosure of the substance of the government's "damaging and otherwise inadmissible" rebuttal evidence in order to "make an informed, intelligent judgment on ... whether it makes sense to open this door." Delia argued that nondisclosure of the rebuttal evidence beforehand would be "unfair" since it could (1) result in an improvident decision to forgo a valid defense and (2) preclude his ability to exclude irrelevant portions of the evidence under Fed.R.Evid. 403.

Although noting that Delia was "not entitled to the government's case" prior to trial, the court reserved decision on the motion until the next day. Later that day, however, Delia informed the court that he no longer planned to introduce testimony regarding the indictments and the inconsistency in the government's theory.

The next day, Delia's counsel raised the issue again, and the following colloquy took place:

MR. SHARGEL [Delia's counsel]: Frankly, I'm troubled. I want to report to the court, by making a decision like that, not knowing what the other proof is, and thinking on it last night, I am reporting to the court that my decision to take this out of the case is motivated by not knowing....

THE COURT: Look, it is up to you what you want to do. If you want to withdraw from that undertaking, that's entirely up to you.

MR. SHARGEL: I understand that.

THE COURT: I, having reflected on that, not since I learned that it was not going to be an issue, but having reflected on it, I don't think you are entitled to a disclosure of those—well, it is hard, it is hard.

MR. SHARGEL: It's a hard issue.

THE COURT: We are right where we were yesterday. You decide what you want to do. If you want to go for it, be my guest, and—

MR. SHARGEL: I can't responsibly go for it. It's a very hard issue.

THE COURT: I guess what I am going to do is, if you decide to go for it, then I am going to find out what the additional information is going to be and then I will make my 403 decision.

MR. SHARGEL: If I go for it.

THE COURT: If you go for it.

MR. SHARGEL: But then I will have committed myself.

THE COURT: You will have committed yourself, but I don't think that there is any way—I don't think it is a violation of your due process rights, not to have that information prior to the time that you make your decision.

MR. SHARGEL: Obviously I see it differently. It's a very hard issue. I think it's a very difficult decision, but I'm going to not "go for it," because I don't drive recklessly.

B. Delia argues that the district court should have ordered disclosure under either Fed.R.Crim.P. 16 or the court's "inherent supervisory power over the conduct of the trial," and that failure to do so denied him a fair trial.

Rule 16 defines the government's obligation to disclose various information that the government intends to introduce at trial or that is material to the preparation of

the defense. It must disclose oral and written statements of the defendant, Rule 16(a)(1)(A); the defendant's prior criminal record, Rule 16(a)(1)(B); books, documents and other tangible objects in the government's possession, Rule 16(a)(1)(C); and reports of examinations or tests, Rule 16(a)(1)(C). None of these requirements covers the government's proposed rebuttal evidence in this case.

Delia argues that Rule 16(d)(1) required such disclosure. That provision states that "[u]pon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate." This provision, entitled "Protective and Modifying Orders," authorizes the district court to limit or otherwise regulate discovery had pursuant to the Rule. It does not require disclosure. Moreover, its language is not mandatory, but permissive: "the court may...." Thus, a denial of disclosure under Rule 16(d)(1) will be set aside only if such denial constituted an abuse of discretion. *Cf. United States v. Giraldo*, 822 F.2d 205, 212 (2d Cir.), *cert. denied*, 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987) (interpreting Rule 16(d)(2)).

The district court did not abuse its discretion in denying Delia's unusual disclosure request, either under Rule 16 or in the exercise of its inherent supervisory power over the conduct of a trial. We know of no legal principle that requires the prosecution to disclose its proposed rebuttal evidence to the defendant, to help him decide whether to pursue a particular contention.

■ Delia further argues that the government's statement concerning the "damaging and otherwise inadmissible testimony" that would "come[ ] in as a result of Delia's door-opening" created "a strong inference that it was simply engaging in gamesmanship and trying to scare the defense away from a legitimate and properly admissible defense theory," and therefore violated his due process right to a fair trial. Delia cites *United States v. Pinto*, 850 F.2d 927 (2d Cir.), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988)

and *United States v. Valentine*, 820 F.2d 565 (2d Cir.1987), two cases dealing with prosecutorial misconduct.

In *Valentine*, this court reversed a defendant's perjury conviction where the prosecutor (1) repeatedly mischaracterized the nature of grand jury testimony at trial and (2) proffered "questionable and perhaps outrightly disingenuous" arguments such that "our confidence in the jury verdict is severely shaken." 820 F.2d at 571. In *Pinto*, although prosecutorial misconduct was not found, we noted the general principle that "[u]nder certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights," and that such circumstances "may involve threats of prosecution or other intimidating conduct that was *designed* to intimidate." 850 F.2d at 932 (citations omitted) (emphasis in original).

This case is a far cry from the serious allegations of prosecutorial misconduct in *Valentine* and *Pinto*. There is no basis in the record for Delia's contention that the government's statement that it might introduce |otherwise inadmissible evidence damaging to Delia was an attempt to coerce him into abandoning a defense he wished to prevent. Rather, the government merely pointed out to Delia, before he introduced his evidence, that its introduction might have adverse consequences he had not foreseen because of how the government would respond. The government told him that to avoid any claim that "the defense was 'sandbagged'" by the government's silence.

Like any other criminal defendant, Delia was forced to make a difficult choice on whether the value of his anticipated evidence would outweigh whatever damaging rebuttal evidence the government might produce. The district court assured Delia that it would not permit hearsay evidence on rebuttal and stated that it would "find out what the additional information is going to be" before deciding whether to exclude any of the government's rebuttal evidence under Rule 403 of the Federal Rules of Evidence. The district court's refusal to

order disclosure of the government's rebuttal evidence in the circumstances of this case did not deny Delia a fair trial.

The judgment of the district court is *affirmed*.