**UNITED STATES of America,
Appellee–Cross–Appellant,**

**v.**

**Harvey MYERSON, Defendant–
Appellant–Cross–Appellee.**

**Nos. 159, 368 and 369, Dockets 92–
1751, 93–1008 and 93–1057.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 1993.

Decided March 7, 1994.

Sean O'Shea, Asst. U.S. Atty. for the Eastern District of New York, Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the Eastern District of New York, Peter A. Norling, Mark Kirsch, Asst. U.S. Attys. for the Eastern District of New York, Brooklyn, NY, of counsel), for Appellee–Cross–Appellant.

Jeremy Gutman, New York City, for Defendant–Appellant–Cross–Appellee.

Before: CARDAMONE, McLAUGHLIN, and LAY,* Circuit Judges.

LAY, Senior Circuit Judge:

Harvey Myerson, a New York attorney, appeals from two judgments entered against

him after he was convicted by juries in two separate trials. Myerson was convicted on three counts of mail fraud, in violation of 18 U.S.C. § 1341, and on two counts of travel fraud, in violation of 18 U.S.C. § 2314,[1] for significantly overbilling his clients and fraudulently claiming that personal charges were legitimate business expenses. In a second trial, Myerson was convicted under a separate indictment of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; of making a false statement on his tax return, in violation of 26 U.S.C. § 7206(1); and of assisting in filing a false tax return for his law partnership, in violation of 26 U.S.C. § 7206(2).[2]

Myerson appeals both convictions. Under the mail fraud counts, Myerson claims (1) that the district court erred in failing to give the jury a missing witness instruction; (2) that the district court erred in refusing to admit certain impeachment testimony; (3) that during summation the prosecutor improperly denigrated Myerson serving in his role as his own defense counsel; and (4) that the district court improperly enhanced Myerson's sentence under the Federal Sentencing Guidelines. Under the tax fraud conviction, Myerson asserts that the district court improperly admitted evidence of prior acts under the Federal Rules of Evidence. We affirm all judgments of conviction. On the cross-appeal, we find the district court did not err in dismissing the two travel fraud counts.

**I. The Billing Fraud Case**

Myerson was charged in a fifteen count superseding indictment with defrauding six clients and his own law firm while he was a partner at the New York law firm he founded, Myerson & Kuhn ("M & K").[3] This

---

* Honorable Donald P. Lay, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The district court dismissed both travel fraud counts for lack of sufficient evidence to sustain the convictions. The government has cross-appealed these dismissals.

2. Myerson was sentenced to a term of sixty months and two concurrent terms of ten months to run consecutively to one another for the mail fraud counts, and to three concurrent terms of

thirty-three months imprisonment for the tax fraud. The separate sentences on the two judgments are being served concurrently. Each sentence required a three-year term of supervised release.

3. The superseding indictment charged Myerson with violating the RICO Act, RICO conspiracy and obstruction of justice, in addition to the mail fraud and travel fraud charges of which he was ultimately convicted. Following the government's dismissal of four conspiracy counts and a

fraud was based on Myerson's submitting a legal fee that overbilled his clients by millions of dollars and by his fraudulent claims that personal charges were legitimate business expenses. Following a contentious six week trial, Myerson was convicted of defrauding three of his clients: Shearson Lehman Hutton, Inc. ("Shearson"), ICN Pharmaceuticals, Inc. ("ICN"), and the Home Insurance Company ("Home").[4] Myerson was also convicted on two travel fraud counts involving Shearson and the United Food & Commercial Workers' Union ("UFCW"), which were dismissed by the district court following the jury verdict.[5]

### The Shearson Fraud

The Shearson fraud was discovered when three young M & K associates found doctored timesheets and computer runs, indicating that M & K attorney hours had been inflated and that Shearson had been billed considerable sums for legal work that had never been performed. The associates delivered the timesheets to Shearson. At trial, the government's witnesses included three of Myerson's partners, various Shearson employees and others who established that Myerson defrauded Shearson, M & K's most important client, out of nearly $2,000,000 in less than one year. Myerson's partners Lloyd Clareman, Mark Segall, and Arthur Ruegger all testified pursuant to cooperation agreements with the government that Myerson "would direct what he wanted the bills to be for particular matters or clients for particular months" and that these billing levels were unrelated to the service needs of the clients. Testimony at trial reflected that Myerson would direct that the actual time reported on associates' and partners' timesheets be adjusted upward to meet Myerson's desired billing levels. Clareman testified that his secretary would first draft Shearson bills based on computer runs and then, at Myerson's direction, he and Segall would inflate attorney hours in order to hike the overall bills.

When the three M & K associates found the doctored timesheets and delivered them to Shearson, along with computer runs and other materials, Shearson performed an internal audit of M & K's bills and found that, conservatively, M & K had overcharged Shearson by $1,996,003. Shearson executives called Myerson and Clareman and confronted them with the results of the audit. Myerson disputed the overcharge and stated he had no knowledge of it. However, after further discussions, Shearson executives failed to accept Myerson's explanations and terminated M & K.

### The ICN Fraud

In like fashion to the Shearson fraud, the government produced evidence that showed ICN had been repeatedly overcharged for legal services that were never actually rendered, and that Myerson billed ICN for several of his pleasure trips, including a trip to the Kentucky Derby. Myerson also obtained thousands of dollars in petty cash and charged it to ICN.

Ruegger and another M & K partner, Daniel Cooper, were the partners responsible for the ICN account. According to government witnesses Segall and Ruegger, during monthly lunch meetings at which billing targets were set for various clients, Cooper was told by Myerson to get the bills for ICN to at least $300,000 per month. Ruegger testified that, on at least one occasion, Cooper told him, "Harvey wants the bills at 300 and I can't get them there."

### The Home Insurance Fraud

Testimony at trial established that Myerson charged thousands of dollars in personal expenses to Home although he did no work for the company. Among these expenses were a charter flight to Myerson's summer home in East Hampton, Long Island, and

stipulation between the parties regarding the RICO count during trial, only six counts of mail fraud, three counts of travel fraud and one count of obstruction of justice were submitted to the jury.

4. Myerson was acquitted of mail fraud with respect to his law firm and the other three clients:

the Urban Development Corporation, the United Food & Commercial Workers' Union and the Kelley Oil Companies.

5. Myerson was acquitted of travel fraud with respect to ICN, and acquitted of obstruction of justice.

over $5,000 in twenty-three petty cash disbursements. Most of the charges were reflected in Home's "Reinsurance" case which was handled by another M & K partner, Philip Kaufman. Kaufman and Home's general counsel testified at trial that Myerson had no involvement in Home cases.

Myerson's defense at trial focused on the frauds committed by other partners (primarily Myerson's close set of proteges, Segall, Clareman and Cooper) who had either pleaded guilty to their involvement in the billing fraud or had entered into cooperation agreements with the government to escape prosecution. On appeal, Myerson does not dispute that the government, as verdict-holder, is entitled to the benefit of all favorable inferences and disputed facts, and indeed Myerson does not dispute that sufficient evidence existed for the jury to find his guilt beyond a reasonable doubt on the counts upon which he was convicted. Rather, he asserts that the district court made specific errors which severely prejudiced his defense and which require reversal of his convictions. We address each of these contentions.

## A. The Missing Witness Instruction

Myerson initially claims that the district court erred in refusing to instruct the jury that it could draw an adverse inference against the government because the United States had failed to immunize the testimony of accomplice and M & K partner Daniel Cooper, whose attorney had informed the district court and Myerson that, if called, Cooper would assert his Fifth Amendment privilege against self-incrimination. Myerson argues that the district court erred further by instructing the jury instead that the jury could draw no inference from the fact that Cooper had not testified.

Cooper was the billing partner for ICN who, according to the government's theory, fraudulently inflated bills at Myerson's direction. Cooper was a participant in several lunch meetings at which Myerson exhorted his partners Clareman and Segall to inflate the bills for Shearson. Additionally, Cooper worked on and was "monitoring" certain matters for Home. Consequently, Myerson argues, Cooper figured significantly with re-

spect to each of the counts on which Myerson was convicted.

On its direct case, the government introduced statements attributed to Cooper that directly inculpated Myerson. However, the government did not call Cooper himself, who had pleaded guilty to defrauding the UFCW, but who had not yet been sentenced. In addition to his guilty plea, Cooper had acknowledged to the government his obstruction of justice, based on his destruction of records that had been subpoenaed in connection with the grand jury investigation. Cooper also admitted his part in falsifying the ICN bills. The government informed the district court, however, that Cooper had no agreement with the government concerning his plea or possible sentence.

During his defense case, Myerson announced in the presence of the jury that he intended to call Cooper as a witness. Myerson acknowledged to the court that he had done this despite having been informed by Cooper's counsel several days earlier that, if called by either party, Cooper would invoke his Fifth Amendment privilege. Cooper's counsel appeared before the district court and confirmed that Cooper would invoke his privilege. Cooper's counsel also informed the district court that Cooper's testimony would not exculpate Myerson.

Myerson did not challenge Cooper's assertion of privilege as invalid, and does not do so in this court. Rather, Myerson asked the court to recognize "the right of the jury to at least hear the questions that were asked." Myerson complained that, among other things, because the government would not immunize Cooper, he was being precluded from testing whether or not Cooper had a "de facto deal" with the government. The district court offered Myerson the opportunity to determine whether there was such a deal, but Myerson failed to take up the offer.

The district court denied Myerson's request to compel Cooper to invoke his privilege against self-incrimination in front of the jury and refused to give an instruction which would allow the jury to draw an adverse inference against the government from its failure to call Cooper as an immunized wit-

ness. The court observed that, "I think, strategically, [Myerson] doesn't really want [Cooper] to testify." In declining to give the requested instruction, the district court stated that "the Government had sufficient reason for not calling [Cooper] and not immunizing him. And I think [Myerson] really did not want the Government to call him, nor did [Myerson] really want him to testify as a witness on [Myerson's] behalf." [6]

In instructing the jury, the district court charged:

> Mr. Cooper declined to testify as a witness in this case. As a result of a hearing that was held outside of your presence, I determined that Mr. Cooper could not be compelled to testify. You should not speculate as to the reasons why Mr. Cooper refused to testify, and you should not draw any inference from the fact that Mr. Cooper did not appear in this case as a witness.

■■■ Myerson insists on appeal that the trial court erred, under the circumstances, in failing to give his requested instruction, and that the jury should have been able to draw an adverse inference against the government from its failure to call Cooper. Myerson also objects to the district court's affirmative instruction that the jury could not draw any inference from the failure of the government to call Cooper as a witness.

It is well settled that when a party has it peculiarly within its power to produce witnesses and fails to do so, "the jury may infer that 'the testimony, if produced, would be unfavorable' to that party." *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir.1988) (quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *Burgess v. United States*, 440 F.2d 226, 231 (D.C.Cir.1970)). However, "when a witness is equally available to both sides, 'the failure to produce is *open* to an inference *against both parties.*'" *Id.* (citation omitted). This court has observed that "the 'availability' of a witness ... depend[s] ...

on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." *Id.* at 1170 (quoting *United States v. Rollins*, 487 F.2d 409, 412 (2d Cir. 1973)).

■ Myerson acknowledges that no "extraordinary circumstances" existed in this case, and thus the district court could not have compelled the prosecution to grant immunity to Cooper to make him available to Myerson. *See Blissett v. LeFevre*, 924 F.2d 434, 441 (2d Cir.) (holding that a prosecutor can be compelled to grant a defense witness immunity only in "extraordinary circumstances," rather than "whenever it seems fair to grant it"), *cert. denied,* —— U.S. ——, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). Moreover, the district court properly rejected Myerson's attempts to call Cooper solely for the purpose of having the jury hear his invocation of the privilege and Myerson acknowledges as much. *See United States v. Deutsch*, 987 F.2d 878, 883–84 (2d Cir.1993). Myerson argues, however, that the government, through its power to compel testimony through a grant of use immunity, had it peculiarly within its power to produce the testimony of Dan Cooper when Cooper asserted his Fifth Amendment privilege. As a result, Myerson argues, he was entitled to a missing witness instruction.

This circuit has never addressed the precise issue before us. Other circuits to consider the issue are unanimous, however, in holding that, despite the government's power to grant immunity, a witness invoking his constitutional rights is unavailable to the government as well as the defense, and no missing witness charge need be given. *See United States v. St. Michael's Credit Union*, 880 F.2d 579, 598 (1st Cir.1989) ("the government's failure to immunize a witness, without more, does not give rise to a missing witness instruction," and no "negative inference may be drawn from that prosecutorial decision"); *United States v. Brutzman*, 731 F.2d 1449,

---

**6.** As noted, Cooper's attorney informed the district court that Cooper's testimony would not help Myerson and that Cooper did not have an agreement with the government. When the district court asked the prosecutor why he did not call Cooper, he explained that Cooper was vul-

nerable to impeachment because he had destroyed documents under subpoena. Finally, when the district court offered to have Cooper testify outside the jury's presence to see what he would claim as privileged, Myerson turned him down.

1453–54 (9th Cir.1984) (where witness invoked Fifth Amendment privilege and government did not immunize testimony, witness was unavailable to both sides); *United States v. Flomenhoft,* 714 F.2d 708, 713–14 (7th Cir.1983) (absent "clear prosecutorial abuse of discretion violating the due process clause," failure to immunize witness invoking privilege does not provide grounds for missing witness instruction), *cert. denied,* 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984); *United States v. Simmons,* 663 F.2d 107, 108 (D.C.Cir.1979) (no missing witness charge where witness was unavailable to both parties as a result of invoking privilege); *United States v. Martin,* 526 F.2d 485, 486–87 (10th Cir.1975) (same).

Myerson argues that the reasoning of *United States v. Salerno,* 937 F.2d 797 (2d Cir.1991), *rev'd on other grounds,* —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992), should control this issue. In *Salerno,* witnesses gave exculpatory testimony under a grant of immunity before the grand jury. At trial, the witnesses were called by the defense and each asserted his Fifth Amendment privilege. The defendants then attempted to have the grand jury testimony admitted under the prior sworn testimony exception to the hearsay rule. *See* Fed. R.Evid. 804(b)(1). We held that, under Fed. R.Evid. 804(b)(1), an exculpatory witness who asserts his Fifth Amendment right when called by a defendant at trial was "available to the government but unavailable to the defendants," and that, therefore, the grand jury testimony was admissible. *Id.* at 805.

The inquiry surrounding whether to give a missing witness instruction is clearly distinguishable from the question of whether prior sworn testimony is admissible. When determining whether to give the missing witness instruction, as in the present case, there is no prior sworn testimony, and the range of reasons behind a prosecutor's decision not to grant immunity does not, automatically, give rise to an inference that the witness's testimony would be favorable to the defendant. Indeed, "[e]xclusivity or peculiarity of power to produce is only one of two necessary predicates for entitlement to the missing witness instruction." *United States v. Norris,* 873

F.2d 1519, 1522 (D.C.Cir.), *cert. denied,* 493 U.S. 835, 110 S.Ct. 113, 107 L.Ed.2d 75 (1989). "When the court is asked to give the instruction, then, a judgment is to be reached as to whether from all the circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one." *Burgess v. United States,* 440 F.2d 226, 234 (D.C.Cir.1970).

As the D.C. Circuit has explained:

The logic underlying the missing witness rule is that where the party with peculiar or exclusive control of a witness fails to call that witness, there must be some reason for its failure. Where there are 'other reasons why [s]he was not called,' the failure of the party having the peculiar power to control the presence of the witness to put her on the stand 'd[oes] not authorize an inference, supported by an instruction, that if [s]he testified [s]he would have done so unfavorably to the' party. That is the situation in the present case.

*Norris,* 873 F.2d at 1522 (quoting *Burgess,* 440 F.2d at 234). In the case of prior sworn testimony, the unavailability of a witness gives rise to circumstances in which the prior testimony should be admitted. The content of the testimony is known to both parties and is known to be exculpatory. Such is not necessarily true when a missing witness instruction is involved. We thus find the situation in *Salerno* readily distinguishable from the present case.

In refusing to require that a missing witness charge be given in each instance that a witness asserts his Fifth Amendment privilege, appellate courts have recognized that such a requirement would unnecessarily infringe on the prosecutorial decision of whether or not to grant immunity. *See Flomenhoft,* 714 F.2d at 713–14. Moreover, a prosecutor's failure to immunize a witness does not, categorically, give rise to an inference that the witness's testimony would be unfavorable to the government. *See Morrison v. United States,* 365 F.2d 521, 524 (D.C.Cir. 1966) ("The large array of considerations which enter into the relatively rare use of immunity grants indicates that government reluctance to use this power cannot reason-

ably be equated to the failure of a litigant to produce an otherwise available witness.").

Consequently, we have noted that "[e]minent authority suggests caution in developing 'elaborate rules of law defining the circumstances when the right [to a missing witness charge] exists.'" *Torres,* 845 F.2d at 1171 (quoting *United States v. Erb,* 543 F.2d 438, 445 (2d Cir.), *cert. denied,* 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976)). This is particularly true in light of "the usual aura of gamesmanship" that frequently accompanies requests for a missing witness charge. *See id.* at 1170–71 (courts unwilling to find witness unavailable when the "defense has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship in an effort to obtain a missing witness charge"); *United States v. Bramble,* 680 F.2d 590, 592 (9th Cir.) (noting that "[w]e deal here with gamesmanship, and we decline to support it"), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 635 (1982). We therefore hold that in the absence of circumstances that indicate the government has failed to immunize an exculpatory witness, a district court does not abuse its discretion by refusing to give a missing witness charge.

■ In the present case, the district court weighed the propriety of giving a missing witness charge, and concluded that "what you want is the jury to draw some inference favorable to you that you called him and he's claiming the privilege here. And somehow that they should assume from that, that it exonerates you which is not necessarily a reasonable assumption." From our review of the record, we find that the district court did not abuse its discretion by refusing to give a missing witness charge. The representations of Cooper's counsel to the district court, the testimony of the other witnesses and Myerson's own refusal to take the district court up on its offer to have Cooper testify were clearly sufficient to give the district court reason to believe Cooper's testimony would inculpate Myerson and, thus, not to give the charge.

We also reject Myerson's claim that it was error for the district court to affirmatively give the instruction it gave, or to prevent Myerson from arguing the inference in summation. These instructions follow from the district court's determination that Myerson was not entitled to a missing witness instruction. Under some circumstances, it may be proper for a trial court to refuse to give a missing witness instruction, but to allow the defendant to argue the inference in summation. *Cf. Torres,* 845 F.2d at 1171 (indicating that where trial court allows counsel to argue the inference, reversal for failure to give missing witness charge is "even more suspect"). We note that Myerson served up a volley of rhetorical questions about Cooper's absence to the jury. While he did not tell the jury what to infer from Cooper's absence, his many questions strongly suggested the inference could be drawn. Under the circumstances of this case, however, we do not find that the district court abused its discretion in giving the instruction it gave.

## B. Impeachment

■ Myerson next argues that the district court erred by failing to admit testimony to impeach co-conspirator statements attributed to Dan Cooper. He contends that the district court's failure to admit this impeachment testimony, coupled with the prosecutor's misleading statement which allegedly led the district court to refuse admission of the evidence, denied him a fair trial.

Arthur Ruegger, one of Myerson's partners, testified during the government's case:

> One time [Cooper] came in after one of those lunches. I think he came into my office or maybe I went into his office. And he just started acting like the plant in Little Shop of [Horrors]. He kept saying 'feed me, feed me, feed me.' He might have other conversations with me where he said, Harvey wants these bills at 300 and I just can't get them there....

> He did, on one occasion, make a reference in substance or in words which said 'Harvey wants the bills at 300 and I can't get them there.'

Approximately three weeks later, during Myerson's defense case, Myerson sought to present the testimony of Douglas Stahl, a former M & K partner, under Fed.R.Evid.

806 to impeach Cooper's alleged statement.[7] In a hearing outside the presence of the jury, Stahl revealed that Cooper, prior to pleading guilty, told Stahl that Cooper had prepared bills based on his own judgment, that Myerson was not involved in the billing, and that he had not inflated the bills and did not do so at Myerson's direction. The district court stated that it would admit the evidence if Myerson could specify the statement of Cooper's that Stahl's testimony would impeach. Myerson could only recall generally that such evidence existed and neither the district court, the government nor Myerson could specify a particular statement.[8]

Myerson argues on appeal that the court's ruling excluding the evidence was error and that the government erroneously, and by implication intentionally, misled the court into excluding the evidence.[9] There is little question that the testimony was admissible under Rule 806. *See United States v. Wali,* 860 F.2d 588, 590 (3d Cir.1988).

As an initial point, we note that Cooper's testimony related only to the ICN count. Myerson attempts to argue that the error pervaded the whole trial. We disagree. Cooper was the billing partner for ICN and the alleged declaration by Cooper, which related to getting ICN bills above $300,000, affected only the ICN count. While Cooper was present at lunch meetings where billing targets were set for the other clients, the statement at issue related only to ICN, and did not bear on the Shearson and Home counts. Thus, we address the error only as it affects the ICN count.

The question of whether the district court's failure to admit Stahl's impeachment testimony was reversible error is clouded somewhat by Myerson's claim of prosecutorial misconduct. Myerson points out that the district court's failure to admit the evidence was error, but rather than argue its prejudi-

cial effect he emphasizes the government's role leading to that error, suggesting that perhaps the error itself was harmless but that the combination of the error and misconduct constitutes reversible error.

■ When prosecutorial misconduct occurs before the jury—for example when a prosecutor engages in improper summation—our analysis involves a determination of whether improper statements cause substantial prejudice to the defendant. *See United States v. Pinto,* 850 F.2d 927, 936 (2d Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). In evaluating whether the government's conduct warrants reversal in such a situation, we must consider whether it resulted in substantial prejudice to the defendant's right to a fair trial, weighing "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Pinto,* 850 F.2d at 936 (quoting *Modica,* 663 F.2d at 1181).

Here, the alleged improper conduct, the prosecution's allegedly misleading declaration to the court that no triggering coconspirator statement had been made, led only to the trial court's refusal to admit impeachment evidence. An error in excluding evidence is reversible error only if the evidence is "material"; that is, " 'if there is a reasonable probability that, had the evidence been [admitted], the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Salerno,* 937 F.2d at 808 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.)); *see also United States v.*

---

**7.** Fed.R.Evid. 806 provides: "When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness."

**8.** Moreover, the government affirmatively responded, "Your Honor, there is no such testimony. There's been no testimony elicited from anyone that Cooper—about Cooper's words that the defendant made him do anything."

**9.** Myerson points out that in closing arguments the next day, the government relied on Ruegger's recollection of what Cooper had said.

*Underwood,* 932 F.2d 1049, 1052 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). Consequently, even assuming, without deciding, that the prosecutor's affirmative statement was improper,[10] under these circumstances we engage in the familiar harmless error analysis that accompanies evidentiary errors. *See id.; United States v. Puglisi,* 790 F.2d 240, 243 (2d Cir.) (holding that even if evidentiary error occurred, error was harmless in light of "ample evidence" of guilt), *cert. denied,* 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986).

The government urges that the impeaching testimony was *de minimis,* and in light of the overwhelming evidence of fraud by Myerson involving the ICN count, the error should be deemed harmless. The government points to the testimony of several witnesses, including Segall, Joan Giordano, Cooper's secretary, and Robert Mandell, an M & K associate, and argues that it overwhelmingly demonstrates Myerson's involvement with ICN bills and conclusively shows his guilt on that count.[11] The government argues that the weight of this evidence distinguishes this case from *United States v. Wali,* 860 F.2d 588 (3d Cir.1988), relied on by Myerson, where a conviction was reversed

for failure to admit exculpatory statements that contradicted the hearsay declarations of a co-conspirator. In *Wali,* the court found the error was not harmless because the statements of the hearsay declarant "were one of the chief sources of evidence used to implicate" the defendant. *Id.* at 591–92.

We find the error in this instance to be harmless. Stahl's testimony directly contradicted Ruegger and indicated that Myerson did not urge Cooper to inflate the ICN bills. However, Cooper's alleged statement was only one sentence in a trial that lasted six weeks.[12] The testimony of the other witnesses clearly demonstrates Myerson's inflation of ICN's bills and fees. Under the circumstances, we hold that the error was not prejudicial.

### C. The Government's Summation

Myerson next argues that the prosecutor's comments in summation constituted *ad hominem* attacks, bringing his character into question and thus constituting reversible error. Without setting forth the summations by both the government and Myerson in great detail, we conclude that Myerson was not prejudiced by the government's personal references to Myerson.[13] "A prosecutor's

---

10. We are somewhat troubled by the government's rapid change in memory. That the prosecutor could so confidently declare that no such testimony existed on one day, and then rely on that exact testimony the next is disturbing. We of course endorse our previous statement that "[t]he prosecutor has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth." *United States v. Universita,* 298 F.2d 365, 367 (2d Cir.), *cert. denied,* 370 U.S. 950, 82 S.Ct. 1598, 8 L.Ed.2d 816 (1962).

11. Segall corroborated Ruegger, describing Myerson's luncheon meetings at which Myerson insisted that various client bills, including ICN's, be inflated. Giordano testified that every month Cooper would take draft ICN bills into Myerson's office, and then return the bills to her, explaining that attorney hours had to be increased and that work descriptions had to be changed. Mandel testified that ICN bills reflected his work on specific matters, and that in fact, he never worked on a matter for ICN. Finally, there was evidence of Myerson's personal expenditures billed to ICN that were unrelated to ICN's business.

12. Its minimal importance is emphasized by the inability of either party, or the district court, to

remember whether any such testimony had been admitted at all, let alone the exact statement.

13. Myerson complains that the prosecution repeatedly attacked his performance as counsel in his own behalf, including referring to Myerson "wind[ing] up the bluster machine that you've seen in the courtroom ... and plunging into the lawyers' tricks, and playing with the facts, and putting gloss on his questions, and changing the facts in his questions...." He argues, in particular, that the prosecutor improperly remarked about gestures Myerson made in the courtroom, where he held his hands out, palms up and motioned upward, and argues that the prosecution impermissibly used this as corroboration of a government witness's testimony about how Myerson urged that bills be inflated. The district court overruled an objection, stating, "[t]he jury witnessed what gestures were made during cross examination. And their recollection will control as to whether [the prosecutor] is accurately representing."

The government responds that "Myerson has lifted a handful of comparatively innocuous instances," in which the government responded in temperate fashion to [Myerson's] inappropriate conduct. Our review of the record supports the

improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant." *Modica,* 663 F.2d at 1181. It is well settled that "the 'prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments,' provided they do not misstate the evidence." *United States v. Smith,* 778 F.2d 925, 929 (2d Cir.1985) (quoting *United States v. Suarez,* 588 F.2d 352, 354 (2d Cir. 1978)). Indeed, this court has held that reversal on the basis of improper prosecutorial statements during summation is warranted only when "the statements, viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial." *United States v. Pena,* 793 F.2d 486, 490 (2d Cir. 1986) (citations omitted).

■ Our inquiry must be particularly searching when a defendant avails himself of his right to represent himself. Yet the inquiry is the same: whether a prosecutor's statements, taken in the context of the entire argument before the jury, prejudiced the defendant and deprived him of a fair trial. *Id.; see also United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) (indicating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

■ This court has "repeatedly held that the Government is ordinarily permitted to respond to arguments impugning the integrity of its case, and to 'reply with rebutting language suitable to the occasion.'" *United States v. Bagaric,* 706 F.2d 42, 60 (2d Cir.) (citations omitted), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Our review of the record compels us to find that any improper conduct on the part of the government was in response to Myerson's attack on the government's case, and the motives behind it, and in sum the prosecutor's summation did not deny Myerson a fair trial. We note that Judge Korman admonished each party to restrict his comments to the evidence, and that the jury was discriminating in its verdict, acquitting Myerson on more counts than it convicted. We have held this to be an important factor in finding prejudice. *See id.* at 61. Moreover, the district court denied Myerson's motions based on the government's alleged impropriety. *See United States v. Marrale,* 695 F.2d 658, 667 (2d Cir.1982) ("we find no basis for overruling the determination of the district court—which surely was in a better position than we to evaluate subtle behavioral defense tactics"), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1434, 1435, 75 L.Ed.2d 793 (1983).

## D. Sentencing

■ Myerson argues that the district court erroneously enhanced his Guidelines level twice based on the same conduct, resulting in impermissible "double counting."

government's argument. As just one example, following the government's opening statement, described by the district court as "reasonable and moderate," Myerson, who delivered the defense opening statement *pro se,* unleashed a personal attack on the prosecutor. Myerson commented that the prosecutor chose to prosecute him because he "wanted a packed courtroom" and was "carried away with all the power that is invested in him." He summed up the government's reason for bringing the case as:

Harvey Myerson was too uppity. You know what being too uppity means. There are people in this jury who know what being too uppity means. It means being a flamboyant, big, cigar smoking Jewish lawyer who flaunted it. He made it and he flaunted it. Now its okay that [a "WASP" have chauffeurs and houses]. But you know what, that doesn't attract these people [the prosecutors].

The district court, in responding to a defense objection during the government's summation, commented to Myerson:

This is summation. Your opening statement was totally inappropriate. It contained many things that were objectionable. He sat through it without making an objection. And I guarantee you, as I sit here, that your summation, if your opening statement was any indication of what's to come, will be ten times more inappropriate than anything he's said or done. . . .

You know, I think you have to understand that this is argument and that people are entitled to a certain amount of rhetorical flourishes in terms of what they say. I've instructed the jury repeatedly and when he crossed the line once, I interrupted him without an objection from you.

In calculating Myerson's total offense level under the Sentencing Guidelines, the district court added two points for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2)(A), and an additional four points for being an "organizer or leader" of criminal activity involving five or more participants, as defined in § 3B1.1(a). Myerson argues that the application of these two subsections are duplicative and increase his sentence twice for the same conduct.

This court addressed this issue in *United States v. Rappaport,* 999 F.2d 57 (2d Cir. 1993), in which we held that increasing a defendant's offense level for a leadership role involving more than five people and for more than minimal planning was not impermissible double counting. Myerson's arguments are indistinguishable from those advanced in *Rappaport,* and we must therefore reject them.

### E. The Dismissed Travel Fraud Counts

■ Myerson was convicted on two counts of defrauding two of M & K's clients, Shearson and the UFCW, in violation of 18 U.S.C. § 2314. The basis of the government's charges was that Myerson had induced travel by Shearson and the UFCW representatives in the course of his fraudulent overbilling of these clients. At sentencing, the district court granted Myerson's motion for judgment of acquittal and dismissed the travel fraud counts on the grounds that the instances of travel were not in furtherance of the fraud. The district court found that the travel "was really in furtherance of their own legal business as to which [Myerson] was overcharging them." The court further found that the travel by the victim was "of the most peripheral kind," suggesting that "[i]t ha[d] nothing directly or remotely to do with the furtherance of the fraud."

The government argues that the travel by the UFCW and Shearson executives was integral in furthering the fraud, and that the district court erred in dismissing the counts following Myerson's conviction on them. We disagree and affirm the district court.

The relevant portion of 18 U.S.C. § 2314 reads as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

*Id.*

The plain language of the statute requires the satisfaction of two elements to support a conviction: (1) that the defendant devised a scheme intending to defraud a victim of money or property of a minimum value of $5,000, and (2) that as a result of this scheme, a victim was induced to travel in interstate commerce. *See United States v. Biggs,* 761 F.2d 184, 187 (4th Cir.1985). The statute is intended " 'to reach the fraudulent scheme whereby the criminal is the efficient cause of the interstate transportation,' " *United States v. Snelling,* 862 F.2d 150, 154 (8th Cir.1988) (quoting *United States v. Ferrara,* 571 F.2d 428, 429–30 (8th Cir.1978)), and requires the defendant to be " 'a motivating force in the victim's transportation.' " *United States v. Kelly,* 569 F.2d 928, 935 (5th Cir.) (quoting *Thogmartin v. United States,* 313 F.2d 589 (8th Cir.1963) (Blackmun, J.)), *cert. denied,* 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978). However, the government does not need to prove that the defendant knew that a victim would travel in interstate commerce or even that such travel was foreseeable. *See id.* at 934; *United States v. Ludwig,* 523 F.2d 705, 707 (8th Cir.1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86 (1976); *United States v. Powers,* 437 F.2d 1160, 1161 (9th Cir.1971); *United States v. Mingoia,* 424 F.2d 710, 713 (2d Cir.1970). Moreover, "[p]roof of personal contact between a defendant and the victim of travel fraud is not necessary for conviction." *Biggs,* 761 F.2d at 187.

The district court found that the travel by representatives of UFCW and Shearson was

not in furtherance of the overbilling fraud, but was instead in furtherance of their own legal business, and was only of peripheral importance to Myerson's fraud on the UFCW and Shearson. We must determine whether both elements of section 2314 were satisfied, and thus whether the district court erred in dismissing either or both of the counts.

### UFCW

The record indicates that UFCW's associate general counsel, Robert Funk, flew from Washington, D.C. to New York on two occasions to meet with Myerson. Funk testified that in May 1988, after his first meeting with Myerson, the union retained M & K to represent it in the damages portion of a trial in South Dakota. Funk testified that he again travelled to meet Myerson in New York in June 1988 "to discuss further handling of the case." During that meeting, Myerson and Funk negotiated "a compromise fee schedule for the litigation of the case," because UFCW could not afford M & K's normal rates. Myerson agreed to such a reduced fee schedule. In August 1988 M & K sent the UFCW its first bill, which included a number of allegedly fraudulent charges.

The government argues that the two elements of § 2314 are satisfied, and that travel for the second meeting clearly served to further a scheme to defraud. We cannot agree. Section 2314 requires that a victim of the fraud be induced to travel in interstate commerce. In other words, Myerson had to have been a "motivating factor" in Funk's travel. Funk testified that he travelled to New York "to discuss further handling of the case." There is certainly no indication that Myerson asked Funk to request a lower fee arrangement, or that the travel was related to anything other than Funk's desire to obtain a lower rate for Myerson's legal services. We cannot find that Myerson violated the travel fraud statute. Under the circumstances, we find the trial court did not err in dismissing the UFCW travel fraud count.

### Shearson

In like fashion, the second travel count involved Shearson's representatives flying to Florida to monitor one of their own cases, the *Gory* matter. Shearson attorney Edward Marx testified:

> I went down several times to West Palm Beach in the preparation stages of the case to work with our local counsel down in Florida, as well as with Lloyd Clareman, who was handling the case for us, Lloyd Clareman of Myerson & Kuhn.... And I went down during the course of the trial to observe and offer what advice I could during the course of the trial itself.

The mere fact that Shearson representatives discussed billing matters with M & K partners while in Florida does not represent a violation of the statute. Marx's testimony indicates that he would have travelled to monitor Shearson's cases whether M & K or another firm was involved in Shearson's representation. We agree with Myerson that Shearson's travel to Florida was not induced by Myerson, and that Myerson was not a motivating force behind that travel as contemplated by section 2314. The fact that Shearson was induced to further compensate Myerson through his representation of Shearson in the *Gory* matter may prove fraud, but it does not involve the direct inducement of Shearson to travel that is required by section 2314.

We therefore find that the district court properly dismissed the Shearson travel fraud count.

## II. The Tax Fraud Case

In a second trial, lasting four days, Myerson was convicted on three counts of conspiracy to defraud the United States, filing a false personal tax return, and causing his law firm to file a false partnership tax return. At trial, the government produced evidence that between 1980 and 1986 Myerson charged several clients over $1 million for legal services that were never rendered. Myerson schemed to have clients, through his law firm, pay Joseph Rahn, a beverage distributor in Philadelphia and Myerson's brother-in-law, as "local counsel" for Rahn's purported legal services. Rahn was not an attorney and he never rendered any services for Myerson's clients. However, Rahn agreed to accept the payments, and then return the money to Myerson.

Rahn testified that he received $408,500 for purported legal services paid by Allegheny Beverage Co., McCrae Oil and Kelley Oil. Rahn testified that he agreed to the arrangement because Myerson told him he was having alimony problems and was trying to conceal monies from his ex-wife. Myerson arranged to have Rahn deposit the funds in Rahn's account and then return the funds by personal check to Myerson. Myerson directed Rahn to file a false 1986 personal tax return and then indicated that he would reimburse him for the tax he paid. Myerson did not report any of his illicit income on his personal tax returns for the years 1980, 1982, 1983 and 1986. The transactions with Rahn served as the basis for the three tax charges.

At trial, Myerson did not dispute that the transactions with Rahn took place. Rather, Myerson contended that he lacked the state of mind to cheat on his income taxes because he had become "irrational" by the excessive alimony demands of his ex-wife. In rebuttal to Myerson's claim, the government produced evidence of other similar acts under Federal Rule of Evidence 404(b) to show Myerson's state of mind and intent. Thomas Wyatt, an attorney, testified that although he had provided no legal services for McCrae Oil, he nevertheless received checks from Myerson's law firm, at Myerson's request and paid by McCrae Oil, and deposited them to his own account. These checks were in the amounts of $65,000 in September 1980; $78,500 in January 1982; $138,500 in October 1982; $126,500 in May 1983; and $187,500 in September 1983. These payments all were for purported legal services Wyatt had not rendered. Myerson had told him that lawyers for his ex-wife had subpoenaed his firm in an effort to seek increased alimony and he needed to conceal the money. Wyatt in turn gave the funds back to Myerson by personal check.

Similarly, in December 1982 and May of 1983, Richard Kammerer, a yacht salesman, received the respective sums of $90,000 and $72,400 from Myerson's firm, reimbursed by McCrae Oil and Allegheny Beverage, to be applied to Myerson's purchase of a boat. The monies were paid to Kammerer for legal fees purportedly provided by Kammerer. Like Rahn, Kammerer was not a member of the bar.

■ The district court admitted the above evidence as "compelling," stating that it "[spoke] volumes about [Myerson's] defense and [his] state of mind." [14] A trial judge is given broad discretion in admitting evidence under Rule 404(b). *United States v. Sappe*, 898 F.2d 878, 880 (2d Cir.1990). Relevant evidence of a defendant's prior bad acts is admissible under Rule 404(b) if that evidence is offered for "a purpose other than to prove the defendant's bad character or criminal propensity," *United States v. Colon*, 880 F.2d 650, 656 (2d Cir.1989), and so long as that evidence is not substantially more prejudicial than probative under Rule 403 of the Federal Rules of Evidence. *See United States v. Mickens*, 926 F.2d 1323, 1329 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992); *see also Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). On appeal, a ruling admitting evidence of other crimes may be overturned only for "a clear abuse of discretion." *Sappe*, 898 F.2d at 880. "To find abuse, the appellate court must conclude that the district court acted arbitrarily and irrationally." *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir.1992).

■ We agree with the district court that Myerson's defense bordered on absurdity. We find, as did the trial court, the 404(b) evidence was clearly admissible. Myerson's argument that the district court failed to engage in a Rule 403 balancing is clearly belied by the record. Following its ruling that Myerson could offer proof that his "crazed" state of mind caused him to want to hide money from his ex-wife, the district court found that the government's similar acts evidence "demolish[ed] the defense,"

14.  The court stated:
    That [the Wyatt and Kammerer $750,000 transactions] says volumes about this defense and the state of mind, not to speak of how this money was generated and what that reflects about the state of mind. But you can't stand up here and tell me that state of mind is the central issue in this case, and then tell me that evidence that clearly goes to that issue is somehow to be not admitted.

was "highly probative," and was "prejudicial in the sense that evidence should be prejudicial, and not in an improper way." The district court "considered the prejudicial value," and concluded that "it's outweighed by its probative value." In no sense was the district court's admission of the Rule 404(b) evidence arbitrary, irrational or an abuse of discretion.

We note that even if the evidence were not admissible, the evidence of Myerson's money laundering and his failure to report it on his income tax was sufficiently strong to render the admission of the 404(b) evidence harmless. We affirm the judgment of conviction on the tax fraud counts.

## III.  CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed with respect to all counts.