T.C. Memo. 2015-42

UNITED STATES TAX COURT

JASON CHAI, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18330-09.                    Filed March 11, 2015.

<u>Frank Agostino</u>, <u>Jeremy M. Klausner</u>, and <u>Lawrence M. Brody</u>, for petitioner.

<u>Timothy A. Sloane</u> and <u>Andrew M. Tiktin</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined a $63,751 deficiency in petitioner's Federal income tax and a $12,750.20 accuracy-related penalty under section 6662(a) for 2003.  In an amendment to answer respondent asserted an increased deficiency and an increased penalty of $627,619 and $125,524,

[*2] respectively.  Petitioner's motion to dismiss the increased deficiency and the increased penalty for lack of jurisdiction was granted on February 13, 2015, by order of the Court.  There are two issues for decision:  (1) whether the $2 million payment petitioner received from Delta Currency Trading, LLC (Delta), in 2003 is nonemployee compensation subject to self-employment tax; and (2) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for 2003.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.  Petitioner resided in Connecticut when he filed the petition.

A.  The Participants

Petitioner graduated from Harvard University with a master's degree in architecture.  Petitioner began his career in Los Angeles but moved to New York in 1999.  At all relevant times, petitioner conducted a successful architecture business.  While attending Harvard petitioner met Andrew Beer, who later married petitioner's cousin.  Beer holds a bachelor of arts degree from Harvard College

[*3] and a master of business administration degree from Harvard Business School.  He has over 20 years of experience in the investment management business.

Beer created and marketed several tax shelters directed to wealthy individuals.  The tax shelters were designed to offset prospective clients' large tax liabilities for a particular year.  To that end, Beer formed several entities to create the tax shelter structure.  Among others, these entities included Delta, Bricolage Capital, LLC (Bricolage), and Counterpoint Capital, LLC (Counterpoint).

Beer formed Bricolage and Delta as Delaware limited liability companies on July 21, 1999, and May 30, 2000, respectively.  Counterpoint was formed as a Delaware limited liability company on March 2, 2000.  At all relevant times, Beer indirectly owned all or a majority of the interests in Delta, Bricolage, and Counterpoint (collectively, Bricolage entities).  Petitioner never owned an interest in Delta or Bricolage.  The Bricolage entities were affiliated by common ownership and shared clients, offices, employees, and resources in 2001 and 2002.  They developed and marketed Beer's tax shelters and advised their clients on the same.

[*4] B.  The Structure

Bricolage advised its clients on Partnership Option Portfolio Strategy (POPS) tax shelters during 2000 and 2001.  Counterpoint and Bricolage advised their clients on Personal Investment Corporation (PICO) tax shelters during 2000 and 2001.  Delta also advised its clients on both the POPS and PICO tax shelters (collectively, tax shelters).

The tax shelters were designed to eliminate Delta's clients' tax liabilities by generating noneconomic tax losses to offset the clients' taxable income.  The tax shelters shared three key characteristics:  (1) each centered around the formation of a flowthrough entity; (2) each involved a straddle comprising offsetting derivatives into which the POPS or PICO entity entered; and (3) each required a transitory partner or shareholder in the POPS or PICO entity to whom the entity allocated income from the derivatives so that a tax shelter investor could recognize offsetting tax losses.  To facilitate the transactions, Delta provided a transitory partner or accommodating party.  The POPS and PICO entities allocated income to the accommodating party and allocated noneconomic losses to Delta's clients to offset their large tax liabilities.  Petitioner was an accommodating party.  For its part, Delta received sizable fees for advising its clients on the tax shelters and facilitating the clients' participation.

[*5]   These transactions were especially profitable for Beer as the majority owner of the Bricolage entities.  For instance, for 2001 Delta reported over $88 million of income, primarily from client fees.  Similarly, for 2002 Delta reported over $93 million of income, primarily from client fees.

In 2002 the Commissioner released Notice 2002-50, 2002-2 C.B. 98, and Notice 2002-65, 2002-2 C.B. 690, advising taxpayers and their representatives that transactions like POPS and PICO were subject to challenge by the Commissioner and had been designated "listed transactions".

C.  Petitioner's Role

After petitioner moved to New York, he lived in Beer's home during the summer of 2002.  That summer, Beer approached petitioner about participating in a new tax strategy Beer had developed to reduce tax liabilities of potential clients.  Beer explained to petitioner that he intended to market the tax shelters to encourage wealthy individuals to become clients of Delta and its affiliated companies.

Beer also explained the tax strategy and the structure of the tax shelters to petitioner.  Petitioner understood that the clients had large tax liabilities for a given year.  Additionally, petitioner understood that the structure was a series of transactions designed to offset clients' tax liabilities and that his role was to serve

**[\*6]** as a partner with the potential clients. These partnerships were integral to the overall structure. Furthermore, petitioner understood he would serve as a conduit and that the potential clients' tax liabilities then would be transferred to him. Beer told petitioner the tax obligations transferred to petitioner would be eliminated by offsetting activities. Petitioner raised concerns about the transactions and asked Beer whether POPS and PICO were "pure tax shelters". Beer assured petitioner these structures had been vetted by attorneys and accountants.

Despite his concerns, petitioner agreed to serve as an accommodating party for the POPS and PICO transactions in exchange for compensation from the Bricolage entities. Petitioner agreed to a $100,000 annual salary plus a signing bonus in exchange for his participation in the transactions. Beer and petitioner also discussed discretionary bonuses petitioner could receive for his involvement in PICO.

D. The Economics of Petitioner's Participation

Petitioner was an accommodating party for at least 131 tax shelters, having reported over $3.2 billion of noneconomic income, allocated to him by the tax shelters, on his 2000 and 2001 income tax returns. This income was approximately equal to the amounts of offsetting noneconomic tax losses allocated to Delta's clients. To relieve petitioner's concerns about increased tax liabilities,

[*7] Beer assured petitioner that there were strategies they could use to offset petitioner's tax liabilities on the basis of his participation in the tax shelters. Notably, petitioner received and reported offsetting losses from the POPS and PICO entities for 2000 and 2001 approximately equal to amounts of income allocated to him from the tax shelters.

E.  JJC Trading, LLC

Petitioner's participation in the tax shelters involved executing numerous transactions to facilitate each of the 131 tax shelters. This included signing binders of legal documents (including articles of incorporation, loan agreements, wire transfers, and redemption request letters) for the PICO and POPS entities. In 2000 petitioner went to the offices of Delta and its affiliates "a lot" and "regularly" to sign documents executing the tax shelter transactions. This signing responsibility was problematic for petitioner because he traveled frequently for his architecture business. He was often unable to be physically present to sign these documents.

Therefore, at Delta's suggestion, in 2001 petitioner formed JJC Trading, LLC (JJC), to facilitate and simplify petitioner's participation in the Bricolage entities. Petitioner was the sole owner of JJC, and Bricolage was JJC's nonmember manager. JJC relieved petitioner of his signature burden because

[*8] JJC's operating agreement (signed by petitioner) gave Bricolage authority to make decisions and sign documents for JJC in petitioner's stead. Petitioner also gave Bricolage power of attorney to make decisions and sign documents for JJC. Petitioner did not maintain books and records regarding his interests in JJC, the tax shelter entities, or the transactions.

F. Petitioner's Compensation

Petitioner received significant compensation from the Bricolage entities in exchange for his participation in the tax shelters. For instance, in 2000 petitioner received $1.2 million from Counterpoint as a signing bonus, and in 2001 JJC received $1 million from Delta. Counterpoint and Delta reported these payments on Forms 1099-MISC, Miscellaneous Income (Form 1099), as nonemployee compensation, and petitioner reported them as income on Forms 1040, U.S. Individual Income Tax Return, and paid the resulting tax. Petitioner also received several other payments from Bricolage and Counterpoint, totaling $100,000 per year for 2001 and 2002 and reflecting Beer's agreement with petitioner that he would receive an annual salary of $100,000 in exchange for his participation. Bricolage and Counterpoint reported all of these amounts as petitioner's wages, and petitioner paid the resulting tax.

[*9] G. The 2003 Payment From Delta

In April 2002 petitioner received an email (April 2002 email) from Delta's chief financial officer Helen Del Bove, referencing petitioner's receipt of $1 million from Delta in 2001. The April 2002 email also notified petitioner he would receive future fees for consulting work he performed for Delta. On March 3, 2003, petitioner received a $2 million payment from Delta.

Before petitioner received the $2 million payment, however, he and Del Bove had exchanged several emails in February 2003 discussing the proper tax treatment of the $2 million payment. Del Bove notified petitioner that Delta was going to wire petitioner the $436,000 remaining in JJC, dissolve that entity, and pay petitioner an additional $2 million. In response, petitioner asked: "To this end, can you fill me in on how this money should be treated as far as my accountant is concerned? Will I be issued a 1099 for the whole amount?" Del Bove responded that the $2 million payment "will be reported on a 1099, so you should tax-plan accordingly." Petitioner again asked for clarification on whether both the $2 million payment and the balance in the JJC account were going to be reported on his Forms 1099 for 2003. Del Bove responded that "[t]he amount you receive from JJC Trading is not income and, therefore, will not be reported on a 1099. That money is from what you had originally invested in JJC Trading. The

**[\*10]** 2mm we pay you will be reported on a 1099, as well as any other subsequent payments."

Beer had authorized, on behalf of Delta, the $2 million payment to petitioner. Beer viewed the $2 million payment as a discretionary bonus for services petitioner had provided to Delta. Consistent with past practice, Delta reported the $2 million on Form 1099 for 2003 as nonemployee compensation.

## H. Petitioner's Tax Reporting

Petitioner did not report the $2 million payment from Delta as taxable income, contending that it was a return of capital from his investments. However, petitioner was not a partner of Delta and did not invest any capital in Delta. Neither petitioner nor JJC reported receiving a share of Delta's income or loss. No Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., was prepared by Delta for petitioner.

All of petitioner's interests in the other tax shelter entities were either sold or redeemed before he received the $2 million payment in 2003. In closing agreements executed between petitioner and the Internal Revenue Service (IRS) with respect to POPS and PICO, petitioner agreed that he had disposed of all his interests in the tax shelter entities by the end of 2001. Petitioner reported the

[*11] amounts he received before 2003 on Forms 1040 for 2000 and 2001. JJC reported amounts received in completed sales of its interests in 2001.

Petitioner reported zero total tax on his income tax return for 2003. Stephen Ellspermann, a certified public accountant, prepared petitioner's income tax return for 2003. Petitioner and Ellspermann discussed the nature of the $2 million payment before filing petitioner's return for 2003. Petitioner told Ellspermann that he did not know the nature of the $2 million payment. He indicated to Ellspermann that the $2 million was from activities managed by Bricolage and that Ellspermann should contact Bricolage to clarify its nature.

Before filing petitioner's income tax return for 2003, Ellspermann asked Del Bove's replacement, Barney Taglialatela, about money transfers between petitioner, JJC, Mercato Global Opportunities Fund, LP (Mercato Global), and Bricolage. He did not ask Taglialatela about money transfers to petitioner from Delta. Ellspermann understood, on the basis of his conversation with Taglialatela, that everything pertaining to the partnerships was included on the Mercato Global Schedule K-1 issued to petitioner. Ellspermann believed that the $2 million payment was included on the Schedule K-1. He believed this, even though he did not specifically ask Taglialatela if the $2 million payment was included on the Schedule K-1. Taglialatela did not tell Ellspermann that the $2 million payment

-12-

[*12] from Delta was not income or that it would not be reported on Form 1099 for 2003. Similarly, Taglialatela never told petitioner or Ellspermann that the $2 million would be reported on Schedule K-1. The $2 million payment was not reported as a withdrawal or distribution on any Schedule K-1 or any combination of Schedules K-1 that petitioner received for 2003.

Before filing his income tax return for 2003, petitioner did not tell Ellspermann about his email correspondence with Del Bove regarding the $2 million payment and that Delta intended it to be income reported on a Form 1099 for 2003. He also did not tell Ellspermann that Del Bove had notified petitioner that he would receive future fees for his consulting work with Delta. Ellspermann first learned of the Delta Form 1099 for 2003 in 2008 during the examination of petitioner's income tax return for 2003. Had Ellspermann known of the Form 1099 for 2003, he would have discussed the tax treatment of the $2 million with Taglialatela.

OPINION

The parties' fundamental dispute is over the character of the $2 million payment Delta made to petitioner in 2003. Petitioner contends that the $2 million payment from Delta is either a return of capital or, alternatively, a gift from Beer to petitioner. Neither would be subject to self-employment tax. Respondent

[*13] contends the $2 million payment is nonemployee compensation subject to self-employment tax that should have been reported on petitioner's return.

## I. The $2 Million Dollar Payment

### A. Burden of Proof and Production

Generally, the taxpayer bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioner contends, however, that pursuant to sections 6201(d) and 7491(a) respondent should bear the burden of proof.

If a taxpayer asserts a reasonable dispute with respect to an item of income reported on an information return filed by a third party and meets certain other requirements, the Commissioner bears the burden of producing reasonable and probative evidence, in addition to the information return, concerning the deficiency attributable to that item. Sec. 6201(d). Respondent has presented evidence, other than the information return filed by Delta, as to the character of the income in issue. We therefore are not relying on the characterization reported in that information return.

The parties stipulated petitioner's receipt of the $2 million payment and Delta's characterization of that payment for tax purposes. Thus, petitioner must show the nontaxable character of the payment. See Tokarski v. Commissioner, 87 T.C. 74, 76-77 (1986) (holding that the taxpayer had the burden of proof to show

**[\*14]** nontaxable nature of payment where the taxpayer indisputably received the income in issue); Price v. Commissioner, T.C. Memo. 2004-103.

If a taxpayer produces credible evidence to support her or his position, complies with substantiation requirements, and cooperates with the Commissioner with regard to all reasonable requests for information, then the burden of proof shifts to the Commissioner. Sec. 7491(a); see Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). A prolonged discussion of burden of proof is unnecessary because we decide this case on the preponderance of the evidence. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008) ("In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof."); see also Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, aff'd, 431 Fed. Appx. 544 (9th Cir. 2011).

B. Character of the Payment

Gross income generally includes all income from whatever source derived, including compensation for services in the form of fees, commissions, or fringe benefits. Sec. 61(a)(1). The character of a payment for tax purposes is determined by the intent of the parties, particularly the intent of the payor, as disclosed by the surrounding facts and circumstances. See Smith v. Commissioner, T.C. Memo.

**[*15]** 1995-410; <u>Keck v. Commissioner</u>, T.C. Memo. 1993-538; <u>Watson v. Commissioner</u>, T.C. Memo. 1960-255. A receipt of capital or a return of capital does not constitute taxable income. See <u>Doyle v. Mitchell Bros. Co.</u>, 247 U.S. 179, 185 (1918); <u>Veenstra & DeHaan Coal Co. v. Commissioner</u>, 11 T.C. 964, 966 (1948); <u>Monico v. Commissioner</u>, T.C. Memo. 1998-10. Similarly, receipt of a gift is not taxable income. See <u>Estate of Maycann v. Commissioner</u>, 29 T.C. 81, 85 (1957); <u>McDermott v. Commissioner</u>, T.C. Memo. 2003-269.

The trial testimony supports the conclusion that the $2 million payment was compensation subject to self-employment tax. Although petitioner attempts to minimize his role in the tax shelters and describes his activities as investments, the record reflects that he provided services to Delta to facilitate the tax shelter transactions. Beer testified that petitioner's role in the tax shelters was a critical component of the transactions and the tax shelters could not have functioned as planned without petitioner's participation. Delta could not have allocated noneconomic losses to its clients without petitioner's acting as the accommodating party. The allocation of $3.2 billion of noneconomic income to petitioner enabled Delta's clients to reap the benefits of an almost equal amount of noneconomic losses to offset their taxable income. Petitioner's role was far from nominal.

[*16] Petitioner argues that because he delegated decisionmaking authority to Bricolage, he did not perform any meaningful services for Delta (or any of the other Bricolage entities). Petitioner's income cannot escape taxation merely because he delegated certain duties to Bricolage and Beer. The risky nature and large receipts of the tax shelters provide ample justification for the high compensation relative to the low amount of personal effort involved.

Petitioner also provided services in a more apparent manner. Petitioner's primary responsibility was to sign binders of formation and organizational documents for the PICO and POPS entities. He testified that there was often a flurry of activity requiring him to go to the Bricolage entities' offices "a lot" and "regularly" to sign large volumes of legal documents to execute the tax shelter transactions. This was a burden for petitioner because he traveled frequently for his architecture business. To alleviate the burden, Delta suggested that he form JJC and sign a document granting a power of attorney to Bricolage.

Petitioner argues that the $2 million payment could not have been compensation for services because after JJC was formed he was completely removed from that process. Contrary to petitioner's assertions, signing the formation and organizational documents was not a menial task but an integral component of creating the tax shelter entities. Whether petitioner subjectively

[*17] understood and appreciated the nature of his actions does not eliminate the significance of the services he provided to Delta and the other tax shelters by signing the formation and organizational documents. Petitioner's subsequent delegation of his signature authority does not absolve him from liability for tax on the compensation he received.

The remainder of the record also reflects that the $2 million payment was compensation. Beer agreed to pay petitioner a $100,000 annual salary plus a signing bonus in exchange for petitioner's involvement. Beer and petitioner also discussed possible discretionary bonuses. Petitioner received several payments consistent with his agreement with Beer.

Petitioner received significant payments from the Bricolage entities characterized and reported as nonemployee income. In 2000 petitioner received a $1.2 million signing bonus from Counterpoint. Counterpoint reported it as nonemployee income on its Form 1099 for 2000, and petitioner paid income tax on the full amount. Similarly, in 2001 petitioner received a $1 million payment from Delta through JJC. Petitioner testified that he viewed it as another bonus. Delta reported the $1 million payment as nonemployee income on Form 1099 for 2001, and petitioner paid income tax on the full amount. Additionally, in 2001 and 2002 petitioner received a $100,000 salary paid by Bricolage and

[*18] Counterpoint and consistent with petitioner's agreement with Beer. Bricolage and Counterpoint reported these amounts as wages, and petitioner paid the resulting tax. There is neither discernable reason nor persuasive justification for treating the 2003 payment differently.

Moreover, Del Bove informed petitioner that the $2 million payment in issue would be reported on the Form 1099 for 2003. In April 2002 Del Bove and petitioner exchanged several emails regarding the $2 million payment and how Delta intended to characterize it. After responding to petitioner's multiple requests for clarification, Del Bove unequivocally notified him that Delta intended to report the $2 million payment on the Form 1099 for 2003. After his email exchange with Del Bove, petitioner still questioned Del Bove's calculations and did not believe that all or part of the $2 million payment was taxable income. Petitioner's testimony is implausible and unpersuasive. He had received compensation in prior years pursuant to his agreement with Beer, and he had notice that the payment was to be treated as compensation by the payor, Delta.

At trial and in his posttrial supplemental brief petitioner objected to the use of the Del Bove emails as hearsay. They are admissible, however, for purposes other than proving that Del Bove was correct in her characterization of the payment, i.e., for purposes other than the truth of her statements. The emails are

[*19] admissible to show that petitioner was on notice that the $2 million payment would be treated as taxable income. See Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 379 (6th Cir. 2009) (holding statement admissible for nonhearsay purpose to prove plaintiff was on notice of imminent danger, ignored warning, and acted negligently). The Del Bove emails are also admissible under the state of mind exception to the hearsay rule to show how Delta intended to report and characterize the $2 million payment. See Fed. R. Evid. 803(3); Estate of Pruitt v. Commissioner, T.C. Memo. 2000-287 (holding testimony regarding decedent's stated intent to include a power to make gifts in powers of attorney admissible under rule 803(3) of the Federal Rules of Evidence); Pan Am. Acceptance Corp. v. Commissioner, T.C. Memo. 1989-440 (holding check with notation "repay debt" admissible under rule 803(3) of the Federal Rules of Evidence as evidence of intent to repay loan).

Petitioner additionally argues that respondent prevented material evidence from being introduced by not providing Del Bove with limited immunity. Petitioner also argues that respondent's failure to do so should create an adverse inference that Del Bove's testimony would not have supported respondent's position. Contrary to petitioner's assertions, only the Department of Justice can grant immunity. See 18 U.S.C. sec. 6003 (2012). Moreover, even if respondent

**[\*20]** could have granted immunity to Del Bove and chose not to, a negative inference cannot be drawn from that prosecutorial decision. See United States v. Myerson, 18 F.3d 153, 158 (2d Cir. 1994) (citing United States v. St. Michael's Credit Union, 880 F.2d 579, 598 (1st Cir. 1989), and relying on that court's determinations that "the government's failure to immunize a witness, without more, does not give rise to a missing witness instruction" and that no "negative inference may be drawn from that prosecutorial decision"); United States v. Forbes, 2007 WL 141952, at *7 (D. Conn. Jan. 17, 2007).

Delta's treatment of the $2 million payment as nonemployee income was consistent with Delta and Counterpoint's treatment of the 2001 and 2002 "bonus" payments. Delta reported both prior payments as nonemployee compensation, and petitioner reported them as self-employment income and paid tax on them. Petitioner has provided no persuasive justification for distinguishing the 2003 $2 million payment from the 2001 or 2002 "bonus" payments. The evidence establishes that the intent of the parties and specifically the intent of the payor Delta was to treat the $2 million payment as nonemployee income subject to tax. Therefore, the character of the $2 million payment is nonemployee income subject to self-employment tax.

[*21] Petitioner additionally argues that he is not subject to self-employment tax on the $2 million payment because he was not engaged in a trade or business as a tax shelter accommodating party. The term "trade or business" has the same meaning under section 1402(a) as under section 162. Sec. 1402(c); see Bot v. Commissioner, 118 T.C. 138, 146 (2002), aff'd, 353 F.3d 595 (8th Cir. 2003). In Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987), the Supreme Court determined that to be engaged in a trade or business under section 162 (and, in this case, section 1402(a)), the taxpayer must be involved in an activity with continuity and regularity and with the primary purpose of receiving income or profit.

The record demonstrates that petitioner's activities were continuous and regular. Petitioner testified that he went to Bricolage's offices "a lot" and "regularly" to execute large volumes of legal documents consisting of formation and organization documents for the tax shelter entities. This fact remained even after petitioner formed JJC in 2001. By forming JJC, making Bricolage JJC's nonmember manager, and giving Bricolage power of attorney over JJC, petitioner's activities remained continuous and regular. Bricolage's actions with respect to JJC are imputed to petitioner as his agent. Petitioner established the legal machinery for others to act on his behalf and cannot now use that delegation of authority as a shield. The record also demonstrates petitioner's profit motive.

[*22] Petitioner was paid for his services through large lump-sum payments that were reported by the payors as nonemployee compensation on Forms 1099, and petitioner reported the payments as self-employment income. In short, the record demonstrates that petitioner accommodated tax shelters with sufficient continuity, regularity, and a profit motive such that he was engaged in a trade or business as a tax shelter accommodating party.

Next, petitioner asserts that the $2 million payment was a return of capital. Aside from his blanket assertions, the evidence establishes that petitioner was not a partner in Delta and did not invest capital in Delta. The parties stipulated that petitioner received the $2 million payment from Delta and Delta's characterization of that payment. Simply stated, the payment could not have been a return of capital because petitioner did not have any capital invested in Delta.

The evidence establishes that petitioner did not have a capital investment in any tax shelter entity after 2001. In closing agreements with the IRS, petitioner agreed that both he and JJC sold or redeemed all of their respective interests in the tax shelter entities by the end of 2001. He recorded amounts received in sales or redemptions of his interests in the tax shelter entities on his income tax returns for 2000 and 2001. Similarly, JJC recorded amounts received in sales or redemptions of its interests in the tax shelter entities on its income tax return for 2001.

[*23] Nevertheless, petitioner asserts that he had investment capital in the tax shelter entities when he received the $2 million payment. Petitioner argues that he understood the initial $1.2 million payment from "Bricolage" would be a signing bonus in 2000 to be used as his investment capital in the tax shelter entities. Similarly, petitioner argues that the $1 million deposit into JJC was "ostensibly" used to invest in the Bricolage entities.

Petitioner did not know which, or how many, of the Bricolage entities' partnerships he had invested in. He did not keep track of the partnerships, his investments in the partnerships, or the transactions they engaged in. He concedes that it is impossible to trace his investments in the Bricolage entities because the tax shelters' structures were too complex and vast to unwind. Finally, he notes that tracing his investments is impossible because he has repeatedly been denied access to necessary financial records.

Petitioner's argument appears to be that the circumstantial evidence of his investment in the Bricolage entities demonstrates that the $2 million payment was a return of capital. We disagree. The preponderance of the evidence establishes that the $2 million payment was not a return of capital from Delta.

Petitioner alternatively argues that if the $2 million payment is not a return of capital, then it was a gift from Beer. Petitioner notes that "[w]hile the Court

[*24] may think the suggestion that the payment was part gift somewhat far-fetched, this case must be decided on the evidence presented." We agree with petitioner's characterization of his suggestion and the necessity of deciding the case on the evidence, but we reject his conclusion. A gift results from a detached and disinterested generosity motivated by affection, respect, admiration, charity, or the like. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). The record is devoid of any evidence suggesting that the payment resulted from detached and disinterested generosity. Rather, the evidence establishes that the payor, Delta, intended the payment as compensation. Notably, Beer testified that he viewed the $2 million payment as a discretionary bonus for services petitioner provided to Delta. The evidence compels the conclusion that the $2 million payment in question was received for services and was neither a gift nor a return of capital contributions that neither petitioner nor Beer could identify.

II. Accuracy-Related Penalty

Finally, we consider whether petitioner is liable for the accuracy-related penalty. See sec. 6662(a). Respondent has the burden of production and must present sufficient evidence that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447. Once respondent satisfies his burden of production, petitioner must present evidence sufficient to persuade

**[*25]** the Court that respondent's determinations are incorrect. See Higbee v. Commissioner, 116 T.C. at 447.

A. Section 6751(b)

Petitioner raises for the first time in his posttrial brief an argument that respondent failed to carry his burden of production by not introducing evidence of his compliance with section 6751(b)(1). Petitioner theorizes that for respondent to meet his burden of production, respondent must introduce evidence that the individual making the penalty determination had his or her immediate supervisor approve the accuracy-related penalty in writing. A party may not raise an issue for the first time on brief if the Court's consideration of the issue would surprise and prejudice the opposing party. See Smalley v. Commissioner, 116 T.C. 450, 456 (2001); Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), aff'd, 796 F.2d 116 (5th Cir. 1986). In deciding whether the opposing party will suffer prejudice, we consider the degree to which the opposing party is surprised by the new issue and the opposing party's need for additional evidence to respond to the new issue. See Pagel, Inc. v. Commissioner, 91 T.C. 200, 212 (1988), aff'd, 905 F.2d 1190 (8th Cir. 1990). In addition, a party may not rely upon a new theory unless the opposing party has been provided with fair warning of the intention to base an argument upon that theory. See id. at 211-212. "Fair warning" means that a

[*26] party's ability to prepare its case was not prejudiced by the other party's failure to give notice, in the notice of deficiency or in the pleadings, of the intention to rely on a particular theory.  Id.

Petitioner's new argument is untimely.  We do not rule on the issue of whether the section 6751(b) requirement is part of respondent's burden of production and express no opinion as to the merits of petitioner's argument. Petitioner did not allege in the petition, in his pretrial memorandum, or at trial that respondent failed to comply with section 6751(b).  By belatedly raising this argument in his posttrial opening brief, petitioner would prejudice respondent by denying him an opportunity to introduce evidence of the IRS's compliance with section 6751(b).  This case was tried before and submitted to a judge who is no longer available to decide it.  The parties were given an opportunity for a further trial but did not request one.  There is no justification for reopening the record at this late stage, and we will not address the section 6751(b) argument.

B.  Substantial Understatement of Income Tax

A taxpayer is liable for an accuracy-related penalty as to any portion of an underpayment attributable to, among other things, a substantial understatement of income tax or negligence.  Sec. 6662(a) and (b)(1) and (2).  There is a substantial understatement of income tax if the amount of the understatement exceeds the

[*27] greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A); sec. 1.6662-4(a), Income Tax Regs. Because we determine that there is a substantial understatement of income tax, we need not address negligence.

Petitioner reported zero total tax for 2003, and we are sustaining the determination in the notice of deficiency that he owes $63,751. Thus, petitioner understated the tax on his return by $63,751. Accordingly, respondent has met his burden of producing evidence that petitioner's underpayment was attributable to a substantial understatement of income tax and therefore petitioner is liable for the accuracy-related penalty absent a showing of reasonable cause or some other defense.

C. Reasonable Cause and Good Faith

Once the Commissioner has met the burden of production, the taxpayer must come forward with persuasive evidence that the penalty is inappropriate because, for example, he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448-449. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the

**[\*28]** extent of the taxpayer's effort to assess her or his proper tax liability. Id.; see Halby v. Commissioner, T.C. Memo. 2009-204.

While reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith, it may when "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. The requirements for reasonable cause are not satisfied if the taxpayer fails to disclose a fact that he knows, or reasonably should know, to be relevant to the proper tax treatment of an item. Sec. 1.6664-4(c)(1)(i), Income Tax Regs.; see Diaz v. Commissioner, T.C. Memo. 2012-280. Additionally, a taxpayer's education, sophistication, and business experience are relevant in determining whether the taxpayer's reliance on the tax advice was reasonable and made in good faith. Sec. 1.6664-4(c)(1), Income Tax Regs.

Petitioner seeks to defend against the accuracy-related penalty by asserting that he relied on Ellspermann, his tax professional, to prepare the tax return and to assure him that the $2 million payment was not taxable income. However, Ellspermann's advice was only as good as the information that petitioner provided to him. Petitioner did not provide Ellspermann with necessary and accurate information.

[*29] In the April 2002 email Del Bove discussed petitioner's receipt of the $1 million payment from Delta in 2001 and notified petitioner that he would receive future fees for consulting work that he had performed for Delta. In February 2003 Del Bove emailed petitioner and notified him that he would be receiving the balance of funds from his JJC account and the $2 million payment from Delta. Petitioner and Del Bove exchanged several followup emails discussing the proper tax treatment of the $2 million payment. Del Bove responded that the $2 million "will be reported on a 1099, so you should tax-plan accordingly." Petitioner asked for additional clarification on whether both amounts would be included on Form 1099 for 2003. Del Bove responded unequivocally that "[t]he amount you receive from JJC Trading is not income, and therefore, will not be reported on a 1099. That money is from what you had originally invested in JJC Trading. The 2mm we pay you will be reported on a 1099, as well as any other subsequent payments." Petitioner asserts that, after this email exchange, he questioned Del Bove's conclusion and exchanged several emails with Bricolage's general counsel regarding how much was due to him and how it would be treated for tax purposes.

Petitioner's testimony on these points is not persuasive. Del Bove unequivocally explained to petitioner, after several clarifications, that the

**[*30]** $2 million would be included on his Form 1099 for 2003 and that he should "tax-plan accordingly." Del Bove's emails clearly explained how Delta intended to characterize the payment. Delta subsequently reported the $2 million payment as nonemployee compensation on petitioner's Form 1099 for 2003, consistent with Del Bove's emails and explanation. Petitioner never informed Ellspermann of his February 2003 email exchange with Del Bove regarding the tax treatment of the $2 million payment or that petitioner was notified it would be treated as income and included on Form 1099 for 2003.

Apparently, petitioner's argument is that he had satisfied himself on the tax treatment of the $2 million payment. We reject petitioner's explanation of why he did not tell Ellspermann about his email exchanges with Del Bove. Instead, petitioner erroneously told Ellspermann that the $2 million payment was part of the activities Bricolage managed and that, if Ellspermann had any questions, he should contact Bricolage regarding the classification and nature of the payment. Ellspermann testified that he would have followed up with Delta regarding a potential Form 1099 for 2003 if he had been informed of petitioner's correspondence with Del Bove.

Petitioner must demonstrate by a preponderance of the evidence that he relied in good faith on his adviser's judgment to establish good cause. See

[*31] Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also 106 Ltd. v. Commissioner, 136 T.C. 67, 77 (2011), aff'd, 684 F.3d 84 (D.C. Cir. 2012). Petitioner cannot establish good-faith reliance because he withheld from Ellspermann a crucial and probative email exchange. Petitioner's decision to withhold that information from Ellspermann was negligent at best or intentionally obstructive at worst. In either event, petitioner failed to inform Ellspermann of facts that he knew, or should have known, were relevant to the proper tax treatment of the $2 million payment. A reasonably prudent person would have informed his or her tax professional as to the disputed characterization of a payment. It was objectively unreasonable for petitioner to fail to do so.

Additionally, petitioner cannot demonstrate good-faith reliance because he knew, or should have known, that Ellspermann's advice was based on incomplete information and an unreasonable assumption. The advice of a professional must not be based on unreasonable factual and legal assumptions and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.; see Canal Corp. v. Commissioner, 135 T.C. 199, 218 (2010); Dunn v. Commissioner, T.C. Memo. 2010-198. The advice must not be based on a representation or

[*32] assumption that the taxpayer knows, or has reason to know, is unlikely to be true. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.

Ellspermann determined the $2 million payment could be omitted from petitioner's tax return on the basis of an unreasonable and erroneous assumption-- that the payment was recorded on Schedule K-1 as to a partner's distributive share. That assumption is erroneous and unreasonable for several reasons. Del Bove's replacement, Taglialatela, credibly testified that he never told petitioner or Ellspermann that the $2 million would be reported on Schedule K-1 or any combination of Schedules K-1. Similarly, Taglialatela credibly testified that he never told Ellspermann that the $2 million payment was not income or that it would not be reported on Form 1099 for 2003. The $2 million payment does not appear on petitioner's 2003 Schedules K-1. Petitioner's failure to inform Ellspermann about his email exchange with Del Bove bolstered Ellspermann's erroneous assumption. Petitioner knew, or had reason to know, that the $2 million would be reported on Form 1099 for 2003. Therefore, Ellspermann's advice was based on a representation or assumption that petitioner knew, or had reason to know, was unlikely to be true.

Finally, we note that petitioner is a highly educated businessperson. Petitioner received his undergraduate and master's degrees from Harvard, and he

[*33] owned and operated a successful architecture business. On the basis of petitioner's education, sophistication, knowledge, and experience, we find that he should have known of the importance of informing Ellspermann that he knew, or had reason to know, the $2 million payment would be treated as nonemployee compensation.

In sum, petitioner has not demonstrated reasonable cause for his failure to report the $2 million payment on his income tax return for 2003. Petitioner did not provide the necessary and accurate information to Ellspermann and, as a result, did not rely in good-faith on Ellspermann's judgment.

We have considered all remaining arguments the parties made and, to the extent not addressed, we conclude they are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.